Vern L. PETERSON, Plaintiff,

v.

BROWNING, a Utah corporation, and David W. Rich, Defendants.

No. 900401.

Supreme Court of Utah.

May 13, 1992.

David B. Havas, Michelle E. Heward, Ogden, for Peterson.

William B. Bohling, David R. Money, Michael Patrick O'Brien, Sharon E. Sonnenreich, Salt Lake City, for Browning and Rich.

DURHAM, Justice:

In 1987, Vern Peterson filed a complaint in federal court against his former employer, Browning, and its personnel director, alleging, among other things, constructive termination in violation of Utah public policy. Peterson was a customs officer with Browning. In support of his public policy claim, Peterson alleges that he was terminated because of his refusal to falsify tax documents in violation of Utah and Missouri law and customs documents in violation of federal law.

This matter has been certified from the United States District Court for the Dis-

trict of Utah pursuant to rule 41 of the Utah Rules of Appellate Procedure. The question of law certified to this court for consideration is:

> Does an action for termination of employment based upon the public policy exception to the employment-at-will doctrine for violation of or refusal to violate federal, other state, or Utah law sound in tort or contract?

On its face, the certified question appears to be singular, but in effect it has two parts: (1) Does the public policy exception to Utah's employment-at-will doctrine encompass violations of federal law and the laws of other states as well as violations of Utah law? (2) Does that exception sound in tort or contract?[1]

## THE PUBLIC POLICY EXCEPTION GENERALLY

■ The public policy exception to the employment-at-will doctrine restricts an employer's right to terminate an employee for any reason. *Burk v. K–Mart Corp.,* 770 P.2d 24, 28 (Okla.1989) (public policy exception attempts to balance competing interests of society, employee, and employer). Under the exception, the at-will doctrine will not insulate an employer from liability where an employee is fired in a manner or for a reason that contravenes a clear and substantial public policy. Utah recognizes the public policy exception to the at-will doctrine. *Hodges v. Gibson Products Co.,* 811 P.2d 151, 165 (Utah 1991); *Loose v. Nature–All Corp.,* 785 P.2d 1096, 1097 (Utah 1989).[2]

Actions falling within the public policy exception typically involve termination of employment for (1) refusing to commit an illegal or wrongful act, (2) performing a public obligation, or (3) exercising a legal right or privilege. Jill S. Goldsmith, Note, *Employment-at-Will—Employers May Not Discharge At–Will Employees for Reasons that Violate Public Policy—Wagenseller v. Scottsdale Memorial Hospital,* 1986 Ariz.St.L.J. 161, 166–67. Here, Peterson alleges that he was terminated for refusing to commit an unlawful act. In a number of cases, other courts have found that the public policy exception applies in similar circumstances. *See, e.g., Tameny v. Atlantic Richfield Co.,* 27 Cal.3d 167, 164 Cal.Rptr. 839, 610 P.2d 1330 (1980) (employee discharged for refusing to engage in illegal price fixing); *Petermann v. International Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am. Local 396,* 174 Cal.App.2d 184, 344 P.2d 25 (1959) (employee terminated for refusing to commit perjury); *Trombetta v. Detroit, Toledo & Ironton R.R.,* 81 Mich.App. 489, 265 N.W.2d 385 (1978) (employee discharged for declining to illegally manipulate state-mandated pollution sampling results); *O'Sullivan v. Mallon,* 160 N.J.Super. 416, 390 A.2d 149 (1978) (employee terminated for refusing to perform medical procedure for which she was not licensed); *Harless v. First Nat'l Bank,* 162 W.Va. 116, 246 S.E.2d 270 (1978) (employee discharged for refusing to violate consumer protection law); *Ostrofe v. H.S. Crocker Co.,* 740 F.2d 739 (9th Cir.1984), *cert. dismissed,* 469 U.S. 1200, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985)

---

**1.** In its brief to this court, Browning raises two additional issues: (1) whether Peterson's public policy claim is preempted by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 to 1461 (1985), and (2) whether there are sufficient facts to put the claim within the public policy exception. Peterson argues that these issues were not raised by the federal judge in his request for certification and that they are issues properly decided by the trial court, not by this court. We agree with Peterson. To address these questions without a request to do so would intrude upon the province of the federal court.

**2.** The Utah Protection of Public Employees Act, Utah Code Ann. §§ 67–21–1 to –9 (1986 & Supp.

1991), protects public employees from discharge for reporting "a violation of a law, or rule promulgated under the law of this state, a political subdivision of this state, or any recognized entity of the United States," *id.* § 67–21–3(1), or for participating "in an investigation, hearing, inquiry, or other form of administrative review held by [a] public body," *id.* § 67–21–3(2). While the statute does not specifically limit the rights of private employers or address the employer who directs an employee to engage in unlawful conduct, it does reflect legislative approval of the basic proposition that it is against the public policy of the state for employers to discharge employees who seek to act within the law.

(employee discharged for refusing to participate in conspiracy to violate Sherman Antitrust Act).

How a court defines "public policy" is a determining factor in whether it will invoke the public policy exception. *Wagenseller v. Scottsdale Memorial Hosp.*, 147 Ariz. 370, 377, 710 P.2d 1025, 1032 (1985); Note, *Protecting Employees At Will Against Wrongful Discharge: The Public Policy Exception*, 96 Harv.L.Rev.1931, 1947 (1983) [hereinafter *Protecting Employees*]. We acknowledge that the term "public policy" is open-ended, *Hodges*, 811 P.2d at 165, and varies from court to court and from case to case. *See generally Protecting Employees* at 1947–50 (discussing arbitrariness with which courts define public policy). We will not attempt here to define the full scope of the term "public policy" for purposes of the exception to the at-will doctrine. At this point, it is sufficient to say that declarations of public policy can be found in our statutes and constitutions. *Hodges*, 811 P.2d at 165–66; *Berube v. Fashion Centre, Ltd.*, 771 P.2d 1033, 1043 (Utah 1989). This does not mean that all statements made in a statute are expressions of public policy. "[M]any statutes simply regulate conduct between private individuals, or impose requirements whose fulfillment does not implicate fundamental public policy concerns." *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 254 Cal. Rptr. 211, 217, 765 P.2d 373, 379 (1988). A number of courts have refused to recognize a cause of action unless the public policy allegedly violated is clear or substantial, *see, e.g., Larsen v. Motor Supply Co.*, 117 Ariz. 507, 573 P.2d 907 (1977) (refusing to recognize public policy action where employees terminated for refusing to consent to take psychological stress evaluation test); *Lampe v. Presbyterian Med. Ctr.*, 41 Colo.App. 465, 590 P.2d 513 (1978) (refusing to recognize public policy action based on broad, general language of nursing statute); *Jones v. Keogh*, 137 Vt. 562, 409 A.2d 581 (1979) (refusing to recognize action where employee was discharged over leave time dispute); *Ward v. Frito-Lay, Inc.*, 95 Wis.2d 372, 290 N.W.2d 536 (1980) (refusing to recognize public policy

violation where employee was fired because relationship with co-worker was causing dissension in work place), or clearly mandated, *see Wagenseller*, 147 Ariz. at 377, 710 P.2d at 1032; *Parnar v. Americana Hotels*, 65 Haw. 370, 652 P.2d 625, 631 (1982); *Palmateer v. International Harvester Co.*, 85 Ill.2d 124, 52 Ill.Dec. 13, 15–16, 421 N.E.2d 876, 878–79 (1981); *Boyle v. Vista Eyewear, Inc.*, 700 S.W.2d 859, 871 (Mo.Ct.App.1985); *Geary v. United States Steel Corp.*, 456 Pa. 171, 319 A.2d 174, 180 (1974); *Thompson v. St. Regis Paper Co.*, 102 Wash.2d 219, 685 P.2d 1081, 1089 (1984).

This court has indicated that it will narrowly construe the public policies on which a wrongful termination action may be based. *Caldwell v. Ford, Bacon & Davis Utah, Inc.*, 777 P.2d 483, 485 (Utah 1989); *Berube*, 771 P.2d at 1043. It is not the purpose of the exception to eliminate employer discretion in discharging at-will employees, *Hodges*, 811 P.2d at 165, or to impose a requirement of "good cause" for the discharge of every employee. Accordingly, we hold that the public policy exception applies in this state when the statutory language expressing the public conscience is clear and when the affected interests of society are substantial. The identification of clear and substantial public policies will require case-by-case development.

## SCOPE OF EXCEPTION: VIOLATIONS OF FEDERAL LAW AND LAWS OF OTHER STATES

We turn first to the question of whether the public policy exception as recognized in this state includes violations of federal law and the laws of other states in addition to violations of Utah law. In *Adler v. American Standard Corp.*, 538 F.Supp. 572 (D.Md.1982), a discharged employee alleged, among other things, that he was terminated from his employment after he threatened to expose violations of federal tax laws. He claimed that the tendency of the firing was to prevent disclosure of illegalities in contravention of federal policy. In response, the employer argued that in an action raising a state's public policy

exception, an employee could not rely on federal law as the source of the public policy contravened. In concluding that federal law can be incorporated as the public policy of a state, the court stated:

> It is in no way offensive to state sovereignty to engraft federal public policy within the civil law. If [the employer's] arguments were to be adopted, this Court would accept the proposition that the [state], as a matter of public policy of its own, should not be concerned with serious violations of federal law.... This Court cannot agree that the [state] should close its eyes and, as a matter of policy, not be concerned with violations of federal law.

*Id.* at 578–79. A number of state courts likewise have recognized that certain federal laws may properly form the basis for a wrongful termination action under a state's public policy exception. *See Tameny v. Atlantic Richfield Co.*, 27 Cal.3d 167, 164 Cal.Rptr. 839, 610 P.2d 1330 (1980) (state action based on violation of federal price fixing laws); *Boyle v. Vista Eyewear, Inc.*, 700 S.W.2d 859 (Mo.Ct.App.1985) (state action based on violation of federal Food and Drug Administration regulations); *Sabine Pilot Service, Inc. v. Hauck*, 687 S.W.2d 733 (Tex.1985) (state action based on violation of federal water pollution laws).

■ We are not prepared to hold, however, that a violation of any federal or other state's law automatically provides the basis for a wrongful termination action based on the Utah public policy exception. Many ancient, anachronistic, and unenforced criminal sanctions remain on the books of local, state, and national governments. Violations of such laws would not necessarily violate Utah public policy. To provide the basis for an action under the public policy exception, a violation of a state or federal law must contravene the clear and substantial public policy of the state of Utah. Although many state and federal laws will reflect Utah public policy, and may, in fact, provide a source of Utah public policy, a plaintiff must establish the connection between the law violated and the public policies of Utah. That has been done here.

In the present case, it is alleged that the employer discharged the employee because he would not falsify tax and customs documents. Such falsification involves serious misconduct and is in all likelihood a felony. *See* 18 U.S.C. § 542 (1988); Mo.Rev.Stat. § 150.260 (1986). "To hold that one's continued employment could be made contingent upon his commission of a felonious act at the instance of his employer would be to encourage criminal conduct upon the part of both the employee and employer and would serve to contaminate the honest administration of public affairs." *Petermann*, 344 P.2d at 27. Based on the information available to us, it appears that the Utah public policy at issue is both clear and substantial.

Persons who are terminated from their employment because they refuse to engage in illegal activities that implicate clear and substantial Utah public policy considerations should be protected regardless of whether the applicable law is that of Utah, the federal government, or another state.[3] The effect on the employee of having to choose between keeping his job or following the law that governs him is the same regardless of the origin of the law. Accordingly, we hold that an attempt to coerce an employee to violate the state tax law and federal customs statute at issue contravenes the clear and substantial public policies of the state of Utah. Thus, a discharge resulting from an employee's refusal to violate such laws is actionable under the public policy limitation.[4]

---

**3.** We note that discerning the public policy implications of federal law or the law of another state may on occasion be difficult for Utah courts. Application of the "clear and substantial" criteria defined above should, however, minimize this problem.

**4.** By including violations of "a law, or rule promulgated under the law of this state, a politi-

cal subdivision of this state *or any recognized entity of the United States*," the Utah Protection of Public Employees Act, Utah Code Ann. § 67–21–3(1) (emphasis added), discussed *supra* note 2, reflects legislative approval of the basic proposition that the public policy of this state embraces the laws of other jurisdictions as well as Utah law.

## CONTRACT VS. TORT CHARACTERIZATION

■ The second issue before this court is whether the public policy exception sounds in tort or in contract. Characterizing a case as tort or contract orients the parties to the requisite elements of proof, permits anticipation of potential defenses, and defines the remedies available. *See* William L. Mauk, *Wrongful Discharge: The Erosion of 100 Years of Employer Privilege*, 21 Idaho L.Rev. 201, 208 (1985) [hereinafter Mauk]. Essentially, the standard of orientation in addressing this problem focuses on the duty which has allegedly been breached, asking whether that duty arises from a promise set forth in the contract or is one imposed by law, independent of contract. *Id.* at 209.

Of those courts recognizing the public policy exception to the at-will doctrine, the overwhelming majority adopt the tort theory.[5] We agree with the majority and hold that the exception sounds in tort.[6] An employer's obligation to refrain from discharging an employee who refuses to commit a criminal act does not depend upon any express or implied promise arising from the employment contract. Instead, the tort cause of action arises out of the contractual relationship. *See DCR Inc. v. Peak Alarm Co.*, 663 P.2d 433, 437 (Utah 1983) (burglar alarm company which breached duty of due care liable in tort even though relationship giving rise to duty originated in service contract between parties); *see also Tameny*, 164 Cal.Rptr. at 843–44, 610 P.2d at 1334; *Malone v. University of Kansas Medical Ctr.*, 220 Kan. 371, 552 P.2d 885, 888 (Kan.1976); *Burk v. K–Mart Corp.*, 770 P.2d 24, 28 (Okla.1989).

The employer's liability is based on "violation of a legal duty independently imposed as a result of what the defendant undertook to do with relation to the [employee's] interests." *DCR Inc.*, 663 P.2d at 437 (quoting Carl S. Hawkins, *Retaining Traditional Tort Liability in the Nonmedical Professions*, 1981 B.Y.U.L.Rev. 33, 36).

Our holding that tort theory applies to the public policy exception is not inconsistent with our decision in *Beck v. Farmers Insurance Exchange*, 701 P.2d 795 (Utah 1985). In *Beck*, we held that a claim based on a breach of the implied covenant of good faith and fair dealing gives rise to a claim for breach of contract. *Id.* at 798. Tort damages in such a case can be obtained only upon a showing of independently actionable tortious conduct. *See id.* at 800 n. 3. Because the public policy exception is imposed by law, the employment agreement is involved only because it forms the basis of the relationship; the agreement is tangential to the reason for discharge. This is not the case with regard to the covenant of good faith and fair dealing. "The covenant of good faith is read into contracts in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purpose." *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 254 Cal.Rptr. 211, 232, 765 P.2d 373, 394 (1988). The very nature of the public policy exception, therefore, distinguishes it from the implied covenant of good faith and fair dealing discussed in *Beck*.

Further, our holding that the public policy exception sounds in tort is consistent with our adoption of the tort of intentional

---

**5.** Only two states, Wisconsin and Arkansas, have adopted the contract theory. The Wisconsin court was influenced largely by the fact that the legislature in that state had prescribed contract damages for other instances of wrongful termination. *Brockmeyer v. Dun & Bradstreet*, 113 Wis.2d 561, 335 N.W.2d 834 (1983). Arkansas adopted the contract theory but recognized that in a proper case, the employee would have a cause of action for the tort of "outrage." *Sterling Drug, Inc. v. Oxford*, 294 Ark. 239, 743 S.W.2d 380, *reh'g denied*, 294 Ark. 239, 747 S.W.2d 579 (1988).

**6.** The application of tort concepts in discharge and other employment contexts is not revolutionary. Tort theories have been applied, for example, to actions raised by aggrieved employees based on negligence, interference with contract, intentional infliction of emotional distress, invasion of privacy, and defamation. Mauk at 225. Similarly, employers have been found liable in tort for failing to furnish a safe work place or proper tools. W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 92, at 663 (5th ed. 1984) [hereinafter Keeton].

interference with economic relations in *Leigh Furniture & Carpet Co. v. Isom,* 657 P.2d 293 (Utah 1982). Under *Leigh Furniture,* to recover damages for that tort, "the plaintiff must prove (1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff." *Id.* at 304. The improper-purpose alternative of the second part of the test "is satisfied where the means used to interfere with a party's economic relations are contrary to law, such as violations of statutes, regulations, or recognized common law rules. Such acts are illegal or tortious in themselves and hence are clearly 'improper' means of interference." *Id.* at 308. The discharge of an employee because of his failure to violate a clear and substantial public policy is an "improper purpose" under this definition. The imposition of tort damages is therefore entirely appropriate and consistent. *Accord* W. Page Keeton, et al., *Prosser and Keeton on the Law of Torts* § 130, at 1029–30 (5th ed. 1984).

As discussed above, the duty at issue in actions for wrongful termination in violation of public policy does not arise out of the employment contract. It is imposed by law, and thus is properly conceptualized as a tort. Significant consequences flow from this conceptual approach, one of which is the type of damages available. When a contract theory is applied, compensation may be limited to economic losses such as back pay. Keeton § 130, at 1029 (citing *Brockmeyer v. Dun & Bradstreet,* 113 Wis.2d 561, 335 N.W.2d 834 (1983)). Moreover, concepts of foreseeability and mitigation apply. *Brockmeyer,* 335 N.W.2d at 841. In contrast, "[a] tort theory will permit the recovery to transcend these limits and may also serve to avoid limitations on recovery that may be imposed by the collective bargaining agreement or other contract." Keeton § 130, at 1029. Most notably, a plaintiff may recover punitive damages under tort law.

In the case of the public policy exception, potential punitive damages will exert a valuable deterrent effect on employers who might otherwise subject their employees to a choice between violating the law or losing their jobs. The employment-at-will doctrine does not grant an employer the privilege of subjecting its employees to the risks of criminal liability. *Boyle v. Vista Eyewear, Inc.,* 700 S.W.2d 859, 872 (Mo.Ct. App.1985). The potential for the imposition of punitive damages under the public policy exception will, we believe, provide an incentive for employers to refrain from using their unique economic position to coerce employee conduct that contravenes clear and substantial public policies. Moreover, it will encourage employees to engage in lawful conduct and report violations of the law.

## CONCLUSION

In response to the two-part question certified to this court, we hold that (1) the public policy exception to Utah's employment-at-will doctrine encompasses violations of federal law and the laws of other states as well as violations of Utah law if those violations contravene the clear and substantial public policies of Utah, and (2) the exception sounds in tort.

STEWART, J., concurs.

HOWE, Associate Chief Justice: (concurring).

I concur. I write to underscore that the public policy exception is to be applied narrowly and only when there exists a violation of a clear and substantial public policy. Accordingly, I do not contemplate that the exception will be frequently invoked or that it should be of concern to employers who are guided by honesty in their employment relations.

To employers in this state who fear the risk of being subjected to punitive damages for a discharge in contravention of public policy, I commend the following statement in the opinion of the court in *Boyle v. Vista Eyewear, Inc.,* 700 S.W.2d 859, 878 (Mo.Ct. App.1985):

> The public policy exception is narrow enough in its scope and application to be no threat to employers who operate with-

in the mandates of the law and clearly established public policy as set out in the duly adopted laws. Such employers will never be troubled by the public policy exception because their operations and practices will not violate public policy.

ZIMMERMAN, Justice: (concurring and dissenting).

I concur with the majority's holding that discharges in contravention of public policy are actionable under Utah law and that firing one for a refusal to violate state tax and federal customs laws, if that is what occurred here, would amount to such an actionable discharge. However, I cannot join without several reservations Justice Durham's explanation of what may constitute public policy for the purposes of this cause of action. I also dissent from the majority's holding that discharge in the violation-of-public-policy cause of action lies in tort rather than contract.

I do not intend to disparage the ends sought by the majority: to provide compensation for employees discharged in violation of public policy and to deter employers from such firings. If the public policy of this state is fixed firmly against conduct an employer requires of an employee upon pain of discharge for breach of contract, the law should sanction neither the contract provision nor the discharge. However, while I agree with the majority's end, I cannot agree with the means chosen to achieve it.

The court today adopts a rather formless tort cause of action as a means to separate from the general body of contractual relations between employer and employee those areas where public policy will not permit contract law to operate. To me, this is akin to using a cleaver to remove a brain tumor. The tool is capable of excising the offending part, but it poses a considerable risk of unpredictable collateral damage to surrounding healthy tissue and a consequent impairment of the entire organ.

The threat of this unintended injury is particularly unfortunate because it is unnecessary. Recasting discharge in violation of public policy as a contract instead of a tort cause of action would accomplish all the positive consequences the majority desires—compensation of injured employees and deterrence of employer misconduct—without the risk of negative effects the majority surely cannot intend but nonetheless invites. Indeed, returning to my earlier analogy, while the tort action is a cleaver, the contract action is a scalpel. I favor the scalpel, with the knowledge that the larger knife of tort will always be available in cases where an egregiously injured employee can prove an independent tort, such as intentional infliction of emotional distress. When selecting from available tools to craft new rules that will affect the relationship between every Utah employer and every Utah employee, we should proceed with special delicacy lest we demonstrate that the fashioning of these rules is a task too subtle for our skills and one better performed by others.[1]

Before discussing the merits, a brief overview of the discharge-in-violation-of-public-policy area is appropriate. The watershed Utah employment-at-will decision is *Berube v. Fashion Centre, Ltd.*, 771 P.2d 1033 (Utah 1989). In *Berube*, we held that the employment-at-will doctrine in Utah amounts only to a rebuttable presumption that the contractual relationship between the parties contemplates that the employer may discharge the employee at any time. *Id.* at 1044 (opinion of Durham, J., joined by Stewart, J.); *id.* at 1051 (Zimmerman, J., concurring in the result); *id.* at 1050 (Howe, J., concurring, joined by Hall, C.J.). The lead opinion in *Berube*, written by Justice Durham and joined only by Justice Stewart, assayed the three categories of so-called "exceptions" to the employment-at-will doctrine that courts around the country have fashioned. We adopted only the "implied-in-fact" exception. *Id.* at 1049

---

1. In this regard, I note that the National Conference of Commissioners on Uniform State Laws has recently proposed a model Employment Termination Act governing wrongful discharge. It enlarges on an employer's traditional liability but limits available remedies. James N. Dertouzos & Lynn A. Karoly, *Labor–Market Responses to Employer Liability* ix n. 2 (The RAND Institute for Civil Justice 1992).

(opinion of Durham, J., joined by Stewart, J.); *id.* at 1052–53 (Zimmerman, J., concurring in the result); *id.* at 1050 (Howe, J., concurring, joined by Hall, C.J.). Since then, we have decided a number of cases under that exception, attempting to flesh out some of its contours. *See, e.g., Arnold v. B.J. Titan Servs. Co.,* 783 P.2d 541 (Utah 1989); *Lowe v. Sorensen Research Co.,* 779 P.2d 668 (Utah 1989); *Caldwell v. Ford, Bacon & Davis Utah, Inc.,* 777 P.2d 483 (Utah 1989).

In addition to the implied-in-fact exception applied in *Berube* and its progeny, a majority of the *Berube* court indicated in dictum that it would also recognize a "public policy" exception to the employment-at-will doctrine, although a majority of the members of the court did not agree on the precise scope of that exception. *Compare Berube,* 771 P.2d at 1042–43 (Durham, J., joined by Stewart, J.) *with* 771 P.2d at 1051 (Zimmerman, J., concurring in the result).

Two years after *Berube,* we again had the opportunity to determine the contours of the public policy exception. *See Hodges v. Gibson Products Co.,* 811 P.2d 151 (Utah 1991). However, a majority of the court again did not address the question. In *Hodges,* the jury based its verdict for the plaintiff alternatively on a finding of malicious prosecution and a finding of wrongful discharge in violation of public policy. Justice Stewart, writing the lead opinion and joined only by Justice Durham, discussed in dictum some aspects of the public policy exception to the at-will presumption, including the sources of relevant public policy. His views followed generally those Justice Durham expressed in *Berube. Id.* at 165–66. However, a majority of the court joined only the portion of the lead opinion

that affirmed the malicious prosecution verdict, finding that ground sufficient to support the judgment without recourse to the theory of discharge in violation of public policy. *Id.* at 168 (Howe, J., concurring), at 168 (Zimmerman, J., concurring in the result, joined by Hall, C.J.).

The case before us today requires that we finally decide several issues regarding the public policy limitation on discharge.[2] First, we must determine whether the sources of the relevant actionable public policies encompass those relied on by plaintiff. Second, we must fix the character of the cause of action. I generally agree with Justice Durham's treatment of the sources issue and will dispense quickly with my suggestions for a more exact and helpful definition. I will then address her characterization of the action as a tort, a course with which I profoundly disagree, and elaborate on my arguments for the equally effective, less hazardous, and more precise remedy of contract.

The first issue Justice Durham discusses is the source of the relevant public policies for the "public policy" limitation on discharge. Although she declines to attempt "to define the full scope of the term 'public policy,'" she does state that "declarations of public policy can be found in our statutes and constitutions." Acknowledging that we have said that the public policy limitation on discharge should be construed narrowly, her opinion holds that the requisite public policy is present when "the statutory language expressing the public conscience is clear and when the interests of society which are at stake are substantial." She concludes that falsifying tax and customs documents would amount to a viola-

---

2. For the sake of clarity, I note that although this rule has been called one of the *exceptions* to the employment-at-will doctrine, it is in reality a public policy *limitation* on all discharges. As a majority of the court in *Berube* viewed it, and as I presume the majority in this case would agree, the doctrine barring discharges in violation of public policy does not depend analytically on whether the at-will presumption would otherwise apply to the specific facts of the case, i.e., whether there was an express or implied contract limiting the employer's discretion to dis-

charge. Rather, the public policy limitation should apply to all employment contracts and should preclude the employer from discharging any employee in a manner or for reasons that directly contravene public policy. The employee operating under an express contract should not be in a less advantageous position than the employee who is at will. *Berube,* 771 P.2d at 1043 n. 10 (Durham, J., joined by Stewart, J.); *id.* at 1051 (Zimmerman, J., concurring in the result).

tion of a "clear" and "substantial" public policy.

I agree with Justice Durham's requirement that any public policy that limits discharge for breach of the employment contract must be clear and substantial. I also agree that Peterson may have alleged such a policy here. However, for the guidance of the bench and bar in future cases, I would expand on what "substantial" means, and I would explain why we conclude that the policies here meet that test.

Both the cases Justice Durham cites and many others she does not cite state in rather conclusory terms, mirrored in Justice Durham's opinion, that for a violation of public policy to be actionable, that policy must be "substantial" or "fundamental." For analytic purposes, I find that the following statement of the California Supreme Court in *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373 (1988), gives some texture to the elusive concept of "substantiality":

> Even where, as here, a statutory touchstone has been asserted, we must still inquire whether the discharge is against public policy and affects a duty which inures to the benefit of the public at large rather than to a particular employer or employee. For example, many statutes simply regulate conduct between private individuals, or impose requirements whose fulfillment does not implicate fundamental public policy concerns. Regardless of whether the existence of a statutory or constitutional link is required under *Tameny* [*v. Atlantic Richfield Co.*, 27 Cal.3d 167, 610 P.2d 1330, 164 Cal.Rptr. 839 (1980) ], disparagement of a basic *public* policy must be alleged....

47 Cal.3d at 669, 254 Cal.Rptr. at 217, 765 P.2d at 379 (emphasis in original).

In other words, one must ask: Is the policy in question one that is of sufficient importance to the public, as opposed to the parties only, that it should constitute an uncompromising bar to discharge? Is it a policy that a court would not permit the parties to derogate by express contract? These are the effects of making a policy one that qualifies for the public policy limitation on discharge, and therefore, these are the factors that should determine the substantiality of any policy violated by a discharge. *See Foley*, 47 Cal.3d at 670 n. 12, 254 Cal.Rptr. at 218 n. 12, 765 P.2d at 380 n. 12.

Following the *Foley* mode of analysis, I conclude that we would not permit an employer to contract expressly with an employee to falsify state tax documentation or evade customs restrictions. Deliberate falsification of information to avoid taxes strikes at the core of the public revenue-raising function and offends our basic public policy notions of fairness in taxation— that all persons similarly situated with respect to the tax laws should pay their share. It is a clear violation of Utah law to falsify a tax return or supporting records. Utah Code Ann. § 76–8–1101(1)(b) (1990). I therefore have no trouble finding that a violation of Missouri's analogous tax law would offend a substantial Utah public policy. *See* Mo.Rev.Stat. § 150.260 (1986). Similarly, it is a clear violation of federal law to evade customs restrictions through false statements. 18 U.S.C. § 542 (1988). I am therefore equally comfortable with the majority's holding that an evasion of federal customs laws would also violate a substantial Utah public policy.

Having dispensed with my clarification of the sources of actionable public policies, I turn to my major and fundamental point of disagreement with Justice Durham's opinion. The certified question asks us to decide whether the cause of action for offending the public policy limitation on discharge should sound in tort or in contract. She opts for tort. I would opt for contract. She favors tort because it invokes the spectre of punitive damages to deter employers from discharges in contravention of public policy. I see contract damages as sufficient to make an employee whole in the ordinary case, but would permit the discharged employee to seek any of the traditional tort remedies if he or she could prove an independent tort. This two-layered course of recovery would preserve the deterrent effects of tort while limiting its

potential for unintended harm. It would guarantee contract damages to all employees discharged in violation of public policy, regardless of the mental state of their employers, something a tort cause of action cannot provide. For those discharged employees who can prove an independent, intentional tort, such as infliction of emotional distress, this two-layered remedy would protect their access to tort damages, including punitives if warranted. We thought this two-layered remedy sufficient to compensate and to deter the injured and the injurer, respectively, in *Beck v. Farmers Insurance Exchange*, 701 P.2d 795, 800 & n. 3 (Utah 1985). *See also Hodges v. Gibson Prods. Co.*, 811 P.2d 151, 163–64 (Utah 1991) (opinion of Stewart, J., joined by Durham, J.); *id.* at 168 (Zimmerman, J., concurring in the result); *Berube v. Fashion Centre, Ltd.*, 771 P.2d at 1033, 1046 (opinion of Durham, J., joined by Stewart, J.); *id.* at 1051 (Zimmerman, J., concurring in the result). Absent a showing that this two-layered approach has proven inadequate, I would apply it here.

I now address in order Justice Durham's several arguments for adopting the tort approach. First, she observes that a majority of courts have taken the tort route. I see little persuasive weight in the bandwagon argument. In fact, we rejected it in *Beck*. There, we adopted a contract approach to the problem of an insurer's not fulfilling the nonwaivable public policy obligation that we read into a first-party insurance contract. In so doing, we recognized that the majority of courts considering the issue had couched the cause of action in tort. *Beck*, 701 P.2d at 798–99. However, we thought that approach analytically flawed and the resulting remedy too crude. *Id.* at 799–801. We noted that despite some rather wooden platitudes to the contrary, in appropriate cases the contract damages could include foreseeable consequential harms and should result in both compensation and deterrence. *Id.* at 799,

801–02. We kept tort in reserve for those cases where the plaintiff could prove an independent cause of action arising out of the same facts upon which the breach of contract claim was grounded. *Id.* at 800 n. 3. Nothing to date has shown this two-layered approach to be inadequate or has challenged its superiority to the tort-only remedy available in other jurisdictions. Absent such a showing, I would adopt a two-layered remedy here, regardless of what other courts have done in the public policy area.

Justice Durham next points to the fact that in several cases this court has relied on tort to remedy public policy violations. *E.g.*, *DCR Inc. v. Peak Alarm Co.*, 663 P.2d 433, 437 (Utah 1983); *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 304 (Utah 1982). She notes that in both cases, the parties' underlying relationship arose from contract, as did the relationship in *Beck*. My response is that those cases provide little guidance in deciding the issue before us. Neither addressed in any detail the policy issues for choosing between tort and contract, and both were decided before *Beck* made clear that plaintiffs could obtain a more generous remedy for breach of certain contractual provisions than might appear available upon first thought.

Without criticizing those particular decisions, I note that in recent years, courts have lacked clear guiding principles by which to determine whether a new cause of action should lie in tort or contract.[3] In my view, the remedy for a breach of a contract provision, whether express or implied, ordinarily should be in contract, unless there is a sound reason for providing otherwise. And in deciding whether such a sound reason exists, we should be guided by pragmatic consideration of the strengths and weaknesses of the respective remedies in light of the environment in which they are to operate. Viewed in this light, our deci-

---

**3.** I note that the Uniform Commercial Code ("U.C.C.") disallows any contract provision that is found "unconscionable." Utah Code Ann. § 70A–2–302 (1990). Certainly, any such provision is made unenforceable because it violates public policy. I find no reasoned distinction between the public policy which underlies the covenant *Beck* implied in a first-party insurance contract or the unconscionability provision in the U.C.C.—both of which are vindicated by only contract remedies—and that which underlies *DCR* and *Leigh Furniture*.

sions in *DCR* and *Leigh Furniture* may or may not have been correct in adopting tort as the primary remedy for breach of an implied limitation on the conduct of a party to a contract. The propriety of choosing a tort remedy over contract depends on practical factors. This determination should focus on such variables as the frequency of the conduct in question in the relevant community, the likelihood of the actions' being done without malice, and the scope and variety of economic arrangements affected by the resulting law. To whatever conclusion such an analysis would lead in the cases of *DCR* and *Leigh Furniture*, it would tell little about the issue that confronts us today. We must analyze this case in its own context.

Justice Durham's final reason for adopting the tort approach seems to be the one on which she places the most weight. She states, "The principal reason for the application of a tort theory to the public policy exception is the availability of damages." The issue of damages has two aspects. First, Justice Durham expresses concern that contract damages might be limited to back pay and might be further restricted by contractual provisions. Second, she states:

> The potential for the imposition of punitive damages under the public policy exception will, we believe, provide an incentive for employers to refrain from using their unique economic position with regard to an employee to coerce conduct which contravenes clear and substantial public policies. Moreover, it will encourage employees to engage in lawful conduct and report violations of the law.

The first of these justifications—concern about the limited damages available for breach of an employment agreement and about possible contractual restrictions on damages—has little weight in Utah after *Beck* and *Berube*.

In *Beck*, we noted that other states have selected tort as the remedy for breaches of covenants implied into first-party insurance contracts as a matter of public policy, in part because they believed that contract remedies were inadequate to make the in-

jured party whole. *Beck*, 701 P.2d at 798. Another justification was that, because the insurer could predict the amount of damages, there was little disincentive to wilful breach of the covenant. *Id.* at 799. These are essentially the same arguments to which Justice Durham alludes.

Our response in *Beck* was not to make such an action lie in tort, but to make it clear that consequential damages could be available for a breach of that particular type of contractual provision and that independent tort actions were not barred. As to consequential damages, we stated that whether they were foreseeable depended on the nature of the contract and the expectations of the parties. But we suggested that in the first-party insurance context, traditional notions of limited contractual damages were inappropriate and that "a broad range of recoverable damages was conceivable," including attorney fees and mental anguish. *Id.* at 802. On the deterrence point, we observed that our ruling did not bar tort recovery, including punitive damages in appropriate cases. We noted that the acts constituting a breach of contract "may also result in breaches of duty that are independent of the contract and may give rise to causes of action in tort." *Id.* at 800 n. 3.

*Beck*'s two-layered remedy already has entered the wrongful discharge arena. In *Berube*, we held that a claim of wrongful discharge in violation of the express or implied terms of an employment agreement did not sound in tort, as some courts have held, but in contract. However, lest it be argued that the remedy available to the employee would be inadequate, and also because of the unique nature of the relationship between employers and employees, we adopted the *Beck* damage standard. *Berube*, 771 P.2d at 1050.

In *Beck*, we also addressed the concern that future insurers might attempt to draft contractual provisions that would deprive the insured of the benefit of the covenant we there implied into the agreement as a matter of law. This parallels Justice Durham's concern here that employers might contractually limit the employees' remedies

for discharges in violation of public policy. Our response in *Beck* was to state, "The duty to perform the contract in good faith cannot, by definition, be waived by either party to the agreement." *Beck*, 701 P.2d at 801 n. 4. A similar observation plainly would be appropriate with respect to the public policy limitation on discharge.

In conclusion, concerns about inadequate recovery and contractual limitations on the right of action are answerable without resort to a tort cause of action.

The second reason Justice Durham advances for preferring tort damages to contract is that punitive damages are available in tort and will deter employers from coercing employees into conduct "which contravenes clear and substantial public policies." I think that in routine cases, the less drastic *Beck* remedy, which expands on traditional notions of available contract damages, will achieve deterrence similar to that achieved in the first-party insurance area governed by *Beck* and in the implied-in-fact contract area governed by *Berube.* In extreme cases, we can achieve further deterrence by not denying employees general damages and punitive damages where the employer has committed an independent tort.

We have two recent examples of Utah cases where tort actions were joined with *Beck*-type contract claims and resulted in awards of general and punitive damages. In *Hodges v. Gibson Products Co.*, 811

P.2d 151 (Utah 1991), a fired employee brought both wrongful discharge and malicious prosecution claims. She recovered on both claims, and we affirmed the tort judgment, including the punitive damage award. *Id.* at 163. In *Crookston v. Fire Insurance Exchange*, 817 P.2d 789 (Utah 1991), the plaintiffs claimed a breach of a *Beck* covenant in their first-party insurance contract. They recovered under both the covenant theory and a fraud theory. Again, we affirmed the judgment on the tort claim.

Based on our experience to date, then, there is no ground for the suggestion that *Beck*'s and *Berube*'s two-layered contract/tort approach will fail to deter employer misconduct. In fact, where an employer discharges an employee for refusing to violate a statute and the employer knows the conduct demanded is unlawful, it should not be difficult to craft a tort complaint that can withstand a motion to dismiss.[4] *Cf. Hodges*, 811 P.2d at 156–61. Consequently, the two-layered approach I propose would be just as effective as the majority's tort remedy in compensating injured employees and deterring egregious misconduct on the part of their employers.

My two-layered contract/tort remedy would also avoid many of the inevitable negative consequences that the majority cannot intend but unfortunately invites. I particularly fear the consequences of a vague, ill-defined tort remedy because the

**4.** Although here we deal only with a certified question and therefore make no factual determinations, I note that on the present state of the pleadings and the record, this case does not appear to be one where an action for an independent tort of intentional infliction of emotional distress would lie. Peterson's is not a classic example of wrongful discharge in violation of public policy. He does not claim that his employer forced him to choose between violating the customs laws and losing his job. Indeed, Peterson admits that his employer was "a stickler for adherence to customs practices."

His theory of recovery is more attenuated. He contends that his punctilious adherence to the customs laws alienated his underlings and superiors because of the extra time and effort required to comply with import regulations. He alleges further that his refusal to falsify Missouri tax documents angered at least one of his peers at Browning's home office in Morgan,

Utah, giving rise to the perception that Peterson was uncooperative and something less than a team player. The combined result was a widespread belief that Peterson was a difficult person and an inflexible and unpopular manager, who was incapable of raising employee morale. It is Peterson's argument that this perception, fueled either in whole or in part by his adherence to the law, led to his constructive termination. Without more, this pleading falls short of demonstrating intentional infliction of emotional distress, which requires that the defendant intended to inflict distress through outrageous and intolerable conduct that offends the generally accepted standards of decency and morality. *Samms v. Eccles,* 11 Utah 2d 289, 293, 358 P.2d 344, 347 (1961).

Of course, all this is not to say that Peterson may not be able to amend his pleadings to state an independent tort of intentional infliction of emotional distress.

employment relationship is one of the most common contractual relationships in society, and certainly one central to the working of the economy. This court has never suggested that in its recent forays into limiting the 19th–century doctrine of employment at will, it is attempting to bar contract law from providing the norms that govern the employment relationship. Specifically, in adopting the public policy limitation on discharge, we intend to limit the scope of permissible contracting only where it trenches on a "clear and substantial" public policy, a policy so crucial that we will not permit parties to contract for its violation. Because we do not wish to chill permissible contracting between employers and employees, we should hone the legal rules we adopt so that the consequences worked by the resulting cause of action are the consequences we anticipate and desire.[5]

Our need for caution is heightened when we consider that even our clearest and best-crafted rules often have results we do not expect. We write our decisions in the abstract, using a supposed set of facts in our attempt to draw a careful line between the permissible and the impermissible. Once they leave our chambers, however, our rules operate in the real world of inexactitude and compromise, where judges and juries are not always consistent on questions of either liability or damages, where only a small percentage of cases actually go to trial, where parties settle cases on evaluations of relative degrees of risk, and where people and institutions attempt to predict risk and often plan their actions so as to avoid any substantial possibility of suit. As a consequence, the fine, bright

line we think we have drawn between the good and the bad becomes, in practice, a broad, unclear swath, encompassing both conduct that clearly runs afoul of the standard we intended and conduct that we had no intention of prohibiting and might, in fact, want to encourage.

Such is the danger here. A candid appraisal of the likely effects of the majority's tort rule suggests that its collateral negative consequences are far greater than necessary to accomplish our objective. These negative consequences flow from both the definition of the prohibited conduct and the open-ended damages available in tort. We may not be able to prevent entirely these consequences at this stage in the law's development, but we can limit them by adopting a two-layered contract/tort approach as we did in *Beck* and *Berube*.

First, some negative collateral consequences flowing from the definition of discharges in violation of public policy are attributable to the vagueness of the prohibition. The majority offers little help in identifying actionable public policies. It does not even state whether the source of such policies must be in criminal or civil statutes or the constitution or whether such policies may be found in the civil common law. Similarly, the definitions of "clear" and "substantial" are elusive. Other than as suggested earlier in this opinion, I am not sure we can give much more specificity at this time without imprudently limiting our freedom to detail the scope of the rule in the context of future cases as we become more sophisticated about the relevant issues. Nonetheless, there can be

---

**5.** A just-released study by The RAND Institute for Civil Justice documents the collateral consequences of recent nationwide changes in the employment-at-will doctrine. These consequences include a decline in the aggregate employment level in states adopting modifications in the employment-at-will doctrine. The severity of this decline appears to vary depending on the type of damages available for various wrongful discharge causes of action. For example, when tort damages are available, the decline in the equilibrium employment level is much greater than when only contract remedies are used. While this study does not settle definitively the collateral consequences of judicial

modification of employment-at-will doctrines or whether they are beneficial, it does suggest that the cost of these collateral consequences "dwarf the direct legal expenses associated with this new litigation," including "costs of jury awards, settlements, and attorney fees." James N. Dertouzos & Lynn A. Karoly, *Labor–Market Responses to Employer Liability* xiii, xiv (The RAND Institute for Civil Justice 1992). I do not suggest that these collateral consequences are bad, but only that they are not intended, much less understood, consequences of our changing the law. For that reason, we should proceed cautiously lest we do more harm than good.

no question that the uncertainty caused by this indeterminate definition of applicable public policy will induce the cautious employer to avoid conduct that is plainly permissible. And discharged employees will press claims that are outside the scope of that which we ultimately will find to be prohibited.

Although such uncertainty is the price we pay for the incremental evolution of the common law, the indeterminacy inherent in a vague prohibition on discharges in violation of public policy is magnified immeasurably when, as the majority holds here, a tort remedy is the sole avenue for redress. First, the very nature of the tort is unclear. I assume the employer must act intentionally, though the majority never says so explicitly. But must the employer know that the conduct it demands violates public policy, or is it enough that the employer intentionally but innocently requires conduct that turns out to violate such a policy?

No matter which path the majority takes, the result reveals the inadequacy and the crudeness of its sole reliance on a tort remedy. If the employer must know that the conduct it demands violates public policy, then a discharged employee who cannot make that showing is left without any remedy because his or her claim for relief lies only in intentional tort. On the other hand, if the majority attempts to avoid this flaw in the protections offered by its tort remedy by deciding that the employer need not be conscious of the fact that the demanded act violates public policy, then it would impose a far more draconian tort liability upon the employer than is necessary to achieve its objectives of compensation and deterrence. An employer who acts in good faith but inadvertently violates public policy by a discharge should not be exposed to a claim for punitive damages.

In contrast, if the approach I suggest were adopted, a contract remedy would be available to the employee discharged in violation of public policy regardless of the state of mind of the breaching party. As we noted in *Beck*, "[E]ven an inadvertent breach of [the implied covenant] can substantially harm the insured and warrants a

remedy." *Beck*, 701 P.2d at 800. The same can be said of an employee discharged in good faith but in violation of some public policy unknown to the employer. On the other hand, the employer who acts wilfully, with full knowledge that the conduct required violated a clear and substantial public policy, will almost certainly be liable, not only in contract, but also for one of the already established torts, as in *Hodges v. Gibson Products Co.*, 811 P.2d 151 (Utah 1991). In sum, a two-layered contract/tort approach has the virtue of better defining the scope of the public policy limitation.

The second type of unnecessary negative consequences flowing from an exclusively tort remedy is a consequence of the open-ended damages available for tort. The possibility of both special and general damages as well as punitives increases the uncertainty for the employer attempting to appraise its risk and adjust its conduct to avoid that liability. As noted above, in appropriate cases, an employer may be unable to estimate readily *Beck* contract damages at the time of breach. *Beck*, 701 P.2d at 801. Given the unique nature of the particular contractual relationship involved, that uncertainty is appropriate. But that indeterminacy pales in comparison with an attempt to estimate even general tort damages, much less the likelihood and amount of any punitive damages. By following the exclusive tort approach, we leave the conscientious employer largely at sea, not only as to determining the propriety of its future conduct, but also as to the consequences of a misstep in its appraisal. As a result, we inevitably will discourage a broad variety of conduct that we in no way have suggested is improper.

There has been no showing that we need to risk this much collateral negative harm to accomplish our purpose. The two-layered contract/tort remedy would increase the certainty of the available damages, thus decreasing the indeterminacy of the law and reducing the breadth of the unintended swath our decision will cut in this sensitive area. Such increased certainty would mean that the law in operation

would conform more closely to the law as we intended it.

At the same time, the contract remedy has advantages over the tort in that by adopting it, we leave fewer unanswered questions as to the scope of the prohibited conduct and we provide both a better array of remedies for the harms suffered by employees and more specific deterrents for the wrongs consciously committed by employers.

For the reasons stated, and perhaps stated again, I would reject the tort approach of Justice Durham and follow the path taken in *Berube*. I would hold that a claim for a discharge in violation of public policy lies in contract.

HALL, C.J., concurs in the dissenting opinion of ZIMMERMAN, J.