2006 UT 66

**George M. LEE and Gerald Lee, Plaintiffs and Petitioners,**

v.

**Robert P. THORPE, The Ranger Insurance Company, and Miles Walter Langley, Defendants and Respondents.**

**No. 20050725.**

Supreme Court of Utah.

Oct. 31, 2006.

---

Gregory J. Sanders, Salt Lake City, for plaintiffs.

Robert Thorpe, Grand Junction, CO, pro se.

Julianne Blanch, David Mull, Salt Lake City, for Ranger Insurance.

NEHRING, Justice:

¶ 1 After greeting Gerald Lee with a handshake, Miles Langley fastened handcuffs to his wrists. Gerald Lee ("Gerald") was a fugitive from Colorado. Miles Langley ("Langley"), described in the district court record as "a large man," was a bail recovery agent, a calling known to most as a bounty hunter. Langley was licensed to practice his trade in Colorado, where Gerald was wanted, but not in Utah, where Gerald was apprehended. Gerald and his brother, George Lee ("George"), sued Langley and the entities associated with the bail bond that Gerald had obtained to gain his freedom in Colorado.

¶ 2 We granted certiorari to determine whether the public policy of Utah permits a bail recovery agent who is licensed in another state, but not in Utah, to apprehend a fugitive in Utah when the fugitive has consented to the apprehension. We conclude that it does when the other state's agent licensing requirements are substantially similar to Utah's.

### FACTUAL AND PROCEDURAL HISTORY[1]

¶ 3 In 1998, Gerald was arrested twice in Colorado. To gain his release from custody

---

1. We note that there is considerable disagreement over several facts in this case, most notably the precise relationship between Langley and A–1 Bail Bonds and exactly what transpired in

pending the disposition of the charges he faced, Gerald bought two bail bonds from A–1 Bail Bonds ("A–1"), a Colorado bonding agency owned by Robert Thorpe. As a condition to obtaining the bonds, Gerald entered into two identical bail bond applications and contracts with Ranger Insurance Company ("Ranger"), a bail bond surety.

¶ 4 Gerald agreed to the terms under the bail contracts, which stated:

1. Ranger shall have control and jurisdiction over me during the term for which my bail bond(s) is executed and shall have the right to apprehend and surrender me to the proper officials at any time for violation of my bail bond(s) obligations to the Court and Ranger as provided by law.

2. It is understood and agreed that any one of the following actions by me shall constitute a breach of my obligations to Ranger and that Ranger and/or its Agent shall have the right to forthwith apprehend and surrender me in exoneration of my bail bond(s):

    a. If I depart the jurisdiction of the court without written consent of the court and Ranger or its Agent.

. . . .

3. If I depart the jurisdiction of the Court wherein my bail bond(s) is posted by Ranger for any reason, and I am captured by Ranger and/or its Agent . . . in a State other than the one in which my bail bond(s) is posted, I hereby agree to voluntarily return to the State of original jurisdiction, and I hereby waive extradition proceedings and further consent to the application of such reasonable force as may be necessary to effect such return.

¶ 5 Gerald soon put these contract terms to the test. He fled Colorado, failed to appear for court hearings, and chose Utah as his sanctuary. A–1 hired Langley to apprehend Gerald. Langley inquired about Gerald's whereabouts with the Uinta County Sheriff, who directed him to the home of Gerald's brother George in Naples, Utah.

Gerald's home. As some of the Plaintiffs' claims were dismissed via summary judgment, we pres-

¶ 6 Langley drove to Naples. Upon arriving at George's home, Langley gained entry by telling George that he represented someone interested in hiring Gerald as a mechanic. When Gerald appeared, Langley shook his hand and attempted to handcuff him. Gerald resisted. Both George and Gerald sustained injuries in the ensuing, brief melee. Langley then removed Gerald from the home to his car, and George called the police. Police officers promptly arrived at the scene and issued citations to each of the men but allowed Langley to take Gerald with him pursuant to the bail contracts. Langley returned Gerald to Colorado.

¶ 7 The Plaintiffs, Gerald and George, sued Langley, Mr. Thorpe, and Ranger for assault and battery, reckless endangerment, and false imprisonment. The case went to trial. The trial court directed a verdict for the Defendants on the Plaintiffs' false imprisonment claim. The jury returned a verdict in favor of Langley on the Plaintiffs' claims for assault and reckless endangerment.

¶ 8 The Plaintiffs appealed to the court of appeals, which rejected all of their claims, despite finding that Langley's apprehension of Gerald violated Utah law governing bail enforcement agents.

¶ 9 We granted certiorari to determine the sole issue of whether a bail agreement violates public policy when it purports to permit a bail enforcement agent not licensed in Utah to apprehend a fugitive.

## ANALYSIS

¶ 10 From the outset of this lawsuit, the parties have wrangled over whether Langley's apprehension of Gerald in Utah, where Langley was not licensed, was legal. The court of appeals analyzed Langley's actions under Utah's Bail Bond Recovery Act, Utah Code Ann. §§ 53–11–101 to –124 (2002), and concluded that Langley's conduct, if prosecuted, would constitute a class A misdemeanor. *Lee v. Langley*, 2005 UT App 339, ¶¶ 12–15, 121 P.3d 33. The court maintained, however, that Langley's susceptibility to prosecu-

ent their version of the facts.

tion under the Act did not translate into civil liability. *Id.* ¶ 15.

¶ 11 The Defendants have insisted throughout that the common law, not the Bail Bond Recovery Act, governs Langley's conduct. They cite the United States Supreme Court case of *Taylor v. Taintor,* 83 U.S. 366, 16 Wall. 366, 21 L.Ed. 287 (1872), as the repository of the applicable common law principle that "[w]hen bail is given, the [fugitive] is regarded as delivered to the custody of his sureties. Their dominion is a continuance of the original imprisonment. Whenever they choose to do so, they may seize him. . . . They may pursue him into another State." *Id.* at 371. The Plaintiffs, on the other hand, claim that the Bail Bond Recovery Act has superseded the common law, rendering *Taylor* irrelevant.

¶ 12 Despite the passion that this question has generated, its answer is not central to our analysis. Obviously, if *Taylor* controls, the apprehension was legal and Utah's public policy would not have been offended. The common law approach, however, reaches its conclusion that extra-territorial apprehensions are lawful by deriving inferences from the functional attributes of bail. The notion that dominion of the bail surety over a fugitive is a continuance of the original imprisonment is not literally true, but is rather a concept that flows logically from the roles played by the participants in the bail process—a defendant, the imprisoning authority, and the surety that stood accountable for a defendant's performance of his obligations. Within the common law justification for extra-territorial apprehension of fugitives, however, there is no reference to contract law, a circumstance that features prominently here.

¶ 13 In this case, Gerald expressly consented to his apprehension outside Colorado. The presence of contractual assent to the very events that gave rise to this lawsuit shifts the focus of this case away from an interpretation of the bail process to a discussion of whether public policy constrains Gerald from bargaining away benefits he might otherwise enjoy under the Bail Bond Recovery Act. We conclude that Gerald's bail contract shielded the defendants from civil liability allegedly incurred through its enforcement of the bail contract, even if Gerald's apprehension exposed Langley to criminal liability in Utah.

## I. THE RELATIONSHIP BETWEEN THE PLAINTIFFS AND THE DEFENDANTS WAS ONE OF CONTRACT LAW, AND THEIR INTERACTIONS WERE CONSISTENT WITH THAT CONTRACT

¶ 14 Two separate and distinct legal relationships emerge from the facts: the first between George and the Defendants based solely on the terms of their contracts and the actions stemming from those contracts, and the second between Langley and the state of Utah based on his conduct and the criminal liability, if any, that arose from it in violation of the Bail Bond Recovery Act.

¶ 15 Under his contractual relationship with the Defendants, Gerald authorized his apprehension by A–1 or its agent and waived any tort claims that might have arisen through reasonable enforcement of the bail contracts. We agree with the court of appeals' observation that "when a conflict arises between parties to a contract regarding the subject matter of that contract, the contractual relationship controls, and parties are not permitted to assert actions in tort in an attempt to circumvent the bargain they agreed on." *Lee,* 2005 UT App 339, ¶ 15, 121 P.3d 33 (citations omitted). Nothing befell Gerald to which he had not consented. In other words, Gerald endorsed the manner in which he was apprehended. The fact that Langley may have violated Utah law when the apprehension occurred is largely irrelevant to this case, just as it would be if Langley had violated traffic laws during the course of the apprehension.

¶ 16 Of course, this analysis prevails only if the underlying contract does not offend Utah's public policy. In this regard, no one has suggested that bail contracts are per se unlawful. As a matter of public policy, we have assigned to bail recovery agents an important role in making good the constitutional promise of bail. Utah Const. art. I, §§ 8–9. Accordingly, we honor the terms of bail contracts, including terms that waive

tort claims, so long as their terms or execution do not violate Utah's public policy. In this light, we now turn to an examination of Utah's public policy relating to bail.

## II.  ENFORCEMENT OF BAIL CONTRACTS BY THOSE QUALIFIED TO DO SO SERVES PUBLIC POLICY

¶ 17 This case requires us to pursue two public policy inquiries. The first invites us to explore the public policy underlying the bail system generally. The second inquiry, closely connected to the first, requires us to examine the public policy considerations relating to the Bail Bond Recovery Act.

### A.  Public Policy Issues of the Bail System

¶ 18 Important and largely non-controversial societal benefits underpin the constitutional guarantee of bail. *See generally* Jonathan Drimmer, *When Man Hunts Man: The Rights and Duties of Bounty Hunters in the American Criminal Justice System,* 33 Hous. L.Rev. 731 (1996). Not only does bail advance the societal interest in not depriving accused parties of their liberty while they still enjoy the presumption of innocence, but it also contributes to the practical need to spare our citizens the expense of confining all defendants while they await trial.

¶ 19 The reliance on bail recovery agents, such as Langley in this case, to enforce bail bond contracts is also sound public policy. The use of bail recovery agents reduces the cost that would otherwise be borne by law enforcement agencies in chasing down defendants who have jumped bail. Bail recovery agents also enjoy an enviable success rate, returning 99.2% of suspects. *Id.* at 762. In fact, "[t]he ultimate beneficiaries of bounty hunters' comprehensive powers are the states themselves, who are freed from the financial burdens of confining suspects until trial, or searching for fugitives, while remaining assured that those defendants appear for trial." *Id.* at 764.

¶ 20 Consequently, many limitations on the scope and efficacy of the bail system are likely to be at odds with public policy. Exposing bail recovery agents and their respective agencies to personal liability for enforcing bail contracts is just such a limitation. Utah has a strong interest in seeing that fugitives from its criminal justice system are apprehended, an interest that is at risk of being compromised if our state erects unnecessary barriers to the enforcement of bail contracts.

¶ 21 The converse is also true. There is little to recommend the prospect of making Utah a safe haven for out-of-state fugitives by making it increasingly difficult for bail recovery agents from other states to track defendants into Utah. *See Boudreaux v. State,* 1999 UT App 310, ¶ 27, 989 P.2d 1103.

### B.  Public Policy and the Utah Bail Bond Recovery Act

¶ 22 The Bail Bond Recovery Act gives legislative expression to the public policy that bail recovery agents meet certain standards and that they acquire a license to demonstrate that they have acquired the training and experience necessary to perform their activities in this state. By deciding that Gerald's bail contracts were enforceable, even though Langley did not have a license to practice his trade in Utah, we reaffirm the general principle that an enforceable contract can coexist with a statute that may conflict with its terms so long as the contract does not offend the public policy to which the statute gives voice.

¶ 23 While we hold that the absence of a license is not, standing alone, so offensive to public policy that it renders Gerald's bail contracts unenforceable, we express no opinion as to whether the contracts would have been enforceable if Langley had not established that he possessed the training and experience necessary to acquire licensure under the Act.

¶ 24 We have previously recognized that "[t]he term 'public policy' is inherently not subject to precise definition." *Berube v. Fashion Centre, Ltd.,* 771 P.2d 1033, 1042 (Utah 1989) (quoting *Petermann v. Int'l Bhd. of Teamsters,* 174 Cal.App.2d 184, 188, 344 P.2d 25 (1959)); *see also Peterson v. Browning,* 832 P.2d 1280, 1282 (Utah 1992). Although public policy eludes attempts at pre-

cise definition, it may be understood as a matter of such fundamental concern to society that the right of individuals to order their affairs by contract may yield to society's interest in preserving or advancing the matter. Constitutions and statutes are often the source of public policy. *Id.* Sometimes, statutes contain purposeful legislative expressions of public policy. *See, e.g.,* Utah Code Ann. § 53A–12–201 (2002) ("It is the public policy of this state that public education shall be free."). It is important to note, however, that "[t]his does not mean that all statements made in a statute are expressions of public policy." *Browning,* 832 P.2d at 1282. Just as not every statutory enactment rises to the level of public policy, conduct that falls short of strict compliance with a statute may not always constitute the type of public policy transgression sufficient to warrant intervention in private contractual relationships.

¶ 25 The legislature has a clear public policy interest in seeing to it that the procedures associated with the granting of bail are fair and do not pose an undue threat to public safety. While this objective is common to all governmental activities, it is particularly true in the realm of criminal justice in general, and bail recovery in particular, because of the public safety concerns that attend the apprehension of fugitives. Bail recovery activities undertaken by agents who do not possess the training and experience deemed necessary to preserve public safety may so offend public policy as to make unenforceable the bail contracts that would otherwise permit apprehensions within our borders.

¶ 26 Here, it is undisputed that Langley was licensed as a bail recovery agent in Colorado. Colorado and Utah share public policy goals regarding bail recovery, and the licensing requirements for bail recovery agents in Colorado are nearly identical to those in Utah. As the court of appeals noted, "It is uncontested that Langley would have had the statutory authority to arrest [Gerald] but for his lack of a license." *Lee,* 2005 UT App 339, ¶ 15, 121 P.3d 33. Thus, the policies that the Bail Bond Recovery Act seeks to promote were protected to the same extent that they would have been had Langley been licensed in Utah.

## CONCLUSION

 ¶ 27 The fact that Langley may have violated Utah law in the apprehension of Gerald is irrelevant when evaluating the separate relationship that arose from the bail contracts. The enforcement of the bail contracts by a bail recovery agent, unlicensed but qualified for licensure in Utah, did not violate the public policy of Utah. Accordingly, we affirm the court of appeals.

¶ 28 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice DURRANT, and Justice PARRISH concur in Justice NEHRING's opinion.