Cathleen L. **RACKLEY**, Plaintiff and Appellee,

v.

**FAIRVIEW CARE CENTERS, INC.,** a Utah corporation, Defendant and Appellant.

No. 971213–CA.

Court of Appeals of Utah.

Dec. 17, 1998.

278

C. Danny Quintana, Danny Quintana & Associates, P.C., Salt Lake City, for Appellant.

Peter C. Collins and Tara L. Isaacson, Bugden Collins & Morton, Salt Lake City, for Appellee.

Before DAVIS, P.J., and WILKINS, Associate P.J., and GREENWOOD, J.

## OPINION

DAVIS, Presiding Judge:

Defendant Fairview Care Centers, Inc. (Fairview) appeals the trial court's judgment in favor of plaintiff Cathleen L. Rackley. We reverse.[1]

## FACTS

Fairview is a family-owned nursing care operation consisting of two care facilities. Rackley managed the Fairview "West" facility from November 1993 through February 1994. During her tenure at Fairview, Rackley made numerous suggestions to Joseph Peterson, an owner and general manager of Fairview, regarding Fairview's compliance with federal and state law and other work-related issues. While not all of Rackley's suggested changes were received favorably by Peterson, many were implemented nonetheless.

In February 1994, Rackley discovered that Karleen Merkley, the Fairview manager responsible for resident funds, had instructed the Fairview staff not to tell resident Muriel Mellen that a $720 check from the Veterans Administration had arrived. Merkley herself was so instructed by Sharon Mellen, Muriel's daughter-in-law who had been managing Muriel's financial affairs for many years since the death of Muriel's husband.[2] Although Sharon had deposited Muriel's check into Muriel's personal bank account, she wanted to personally tell Muriel of its arrival in the hopes of convincing Muriel, an Alzheimers resident, that the money should be spent for the purchase of a wheelchair for her.

When Rackley discovered Muriel's check and the fact that Muriel had not yet been informed of its arrival, she took it upon herself to not only tell Muriel, but to also call Sharon at her place of employment to express her "concerns" about the impropriety of keeping the information from Muriel. Rackley did not take the initiative to tell Peterson, nor did she contact any outside authorities in an attempt to have the situation investigated.[3]

Sharon was upset that, despite her instructions, Rackley had made a unilateral decision to tell Muriel about the check.[4] Sharon consequently called Peterson and told him what had happened. Peterson then met with Rackley, Merkley, and Sallie Maroney, the manager of the Fairview "East" facility. Both Maroney and Merkley received a written reprimand for failing to tell Muriel about the check. Peterson also instituted a new official policy requiring that residents be informed of all incoming funds, regardless of who is assisting them with their financial affairs.

Peterson also reprimanded Rackley and told her to call Sharon to apologize for the incident. However, after further thought, Peterson decided to terminate Rackley and called her into a meeting. While the testimony is conflicting as to whether Peterson had changed his mind and decided to keep Rackley as the Fairview "West" administrator, the trial court found that Peterson did, in fact, fire Rackley.

Rackley filed suit claiming she was wrongfully discharged by Fairview in violation of public policy. After a bench trial, the trial court ruled that "[d]efendant's said termination of plaintiff's employment implicated a clear and substantial public policy, to wit: the right of the residents of defendant's Salt

---

1. We have determined that "[t]he facts and legal arguments are adequately presented in the briefs and record and the decisional process would not be significantly aided by oral argument." Utah R.App. P. 29(a)(3).

2. In fact, Muriel had executed a document that provided: "To whom it may concern[:] I hereby certify that Sharon Mellen has authorization to assist me in managing my personal needs allowance funds." The document was a modified form that originally read: "I hereby certify that Fairview Care Center has authorization to assist me in managing my personal needs allowance funds." "Fairview Care Center" was marked out and Sharon Mellen's name was penned in.

3. Rackley eventually contacted the Utah Department of Health and Safety and the Office of the Ombudsman, but not until after her employment separation from Fairview.

4. The testimony is conflicting as to the tone of the conversation between Rackley and Sharon. Sharon insists that Rackley insinuated that Sharon had stolen the money, while Rackley denies that charge.

Lake City west side facility (including resident Muriel Mellen) to be informed of the fact that resident personal monies had arrived at the facility."[5] The trial court further determined that "[d]efendant violated that public policy by, in terminating plaintiff's employment, punishing plaintiff for engaging in conduct furthering that policy."[6] The trial court then concluded that

> Defendant unlawfully terminated the employment of plaintiff in violation of the public policy of the State of Utah, including but not limited to the clear and substantial public policy considerations set forth in the following:
>
> Article I, Section 1 of the Utah Constitution[;]
>
> Article I, Section 27 of the Utah Constitution[;]
>
> 42 U.S.C. §§ 3058g(a)(3) and (5)[;]
>
> *Utah Code Ann.* §§ 62A–3–201, et seq.[;]
>
> 42 U.S.C. § 1396[r(c)(6)[7];]
>
> *Utah Admin. Code* § R432–150–4[; and]
>
> 42 C.F.R. § 483.10[8]

Fairview appeals the trial court's legal conclusion that a clear and substantial public policy exists supporting Rackley's wrongful discharge claim.[9]

**5.** Although the trial court characterized this determination as a finding of fact, a determination of what amounts to a clear and substantial public policy is a legal conclusion.

**6.** The evidence suggests that Fairview fired Rackley for reasons having little, if anything, to do with the furtherance of public policy. However, because Fairview does not challenge the trial court's findings of fact, this court must accept them as entered.

**7.** The trial court cites to 42 U.S.C. § 1396(i)(6). However, as noted by Fairview, this section does not exist. The parties seem to agree that the appropriate citation is to 42 U.S.C. § 1396r(c)(6). We accordingly use that section of the United States Code in our analysis.

**8.** As to the trial court's reliance on federal law, we note the Utah Supreme Court has held that "the public policy exception to Utah's employment-at-will doctrine encompasses violations of federal law ... [only] if those violations contra-

## ISSUE AND STANDARD OF REVIEW

 Fairview argues the trial court erred by concluding that a clear and substantial public policy exists that a nursing home resident must be immediately notified by a care facility employee of personal funds arriving at the nursing facility.[10] Whether a clear and substantial public policy exists supporting a wrongful discharge claim based on an employer's violation of that policy is a question of law. We review questions of law for correctness, giving no deference to the trial court's legal conclusion. *See Ryan v. Dan's Food Stores, Inc.*, 350 Utah Adv. Rep. 3, 3, 972 P.2d 395, 399–400 (Utah 1998); *Retherford v. AT & T Communications*, 844 P.2d 949, 958 (Utah 1992).

## ANALYSIS

 It is well established Utah law that an employment relationship is presumptively at-will. *See Ryan*, 350 Utah Adv. Rep. at 4, 972 P.2d at 400–02; *Fox v. MCI Communications Corp.*, 931 P.2d 857, 859 (Utah 1997); *Retherford*, 844 P.2d at 958; *see generally Berube v. Fashion Centre, Ltd.*, 771 P.2d 1033, 1041 (Utah 1989). The at-will presumption "allows both the employer and the employee to terminate the employment for any reason and allows the employer to do so without extending any procedural safeguards

vene the clear and substantial public policies *of Utah." Peterson v. Browning*, 832 P.2d 1280, 1285 (Utah 1992) (emphasis added).

**9.** Fairview also argues that if this court concludes the trial court did not err in ruling that a public policy exists, then Rackley's conduct for which she was terminated was not in furtherance of the established policy. Based on our disposition, however, we need not address this issue.

**10.** It is important to note that the alleged public policy found by the trial court is very narrow. There is no suggestion that the funds were improperly dealt with or that failure to inform Muriel was a component of any attempt by anyone to improperly deal with the funds. Such circumstances may implicate a public policy which would overcome the at-will presumption. *See Fox v. MCI Communications Corp.*, 931 P.2d 857, 860 (Utah 1997) ("We have acknowledged that the enforcement of a state's criminal code constitutes a clear and substantial public policy.").

to an employee, except as required by law." *Fox*, 931 P.2d at 859.

■ The at-will presumption is not conclusive, however.

> An at-will employee may overcome th[e at-will] presumption by demonstrating that (1) there is an implied or express agreement that the employment may be terminated only for cause or upon satisfaction of another agreed-upon condition; (2) a statute or regulation restricts the right of an employer to terminate an employee under certain conditions; or (3) the termination of employment constitutes a violation of a clear and substantial public policy.

*Id.* (footnotes omitted). Here, Rackley argues that, by discharging her for telling Muriel about the Veterans Administration check, Fairview fired her in violation of a clear and substantial public policy.

■ To succeed on a wrongful discharge claim based on a violation of public policy, a party must satisfy a four-prong test. The "employee must show: (i) that his employer terminated him; (ii) that a clear and substantial public policy existed; (iii) that the employee's conduct brought the policy into play; and (iv) that the discharge and the conduct bringing the policy into play are causally connected." *Ryan*, 350 Utah Adv. Rep. at 6, 972 P.2d at 404 (footnote omitted). For purposes of this appeal, Fairview concedes that Rackley was terminated. Thus, we move on to the second prong, whether there was a clear and substantial public policy that nursing home residents have the right to be informed of personal monies arriving at the facility.

Our supreme court has repeatedly underscored the fact that "only clear and substantial public policies will support a claim of wrongful discharge in violation of public policy." *Id.; accord Peterson v. Browning*, 832 P.2d 1280, 1282 (Utah 1992) ("[W]e hold that the public policy exception applies in this state when the statutory language expressing the public conscience is clear and when the affected interests of society are substantial."); *Berube*, 771 P.2d at 1043 ("We also stress that actions for wrongful termination based on this exception must involve *sub-stantial* and *important* public policies."). Additionally, "[t]his court . . . will narrowly construe the public policies on which a wrongful termination action may be based." *Peterson*, 832 P.2d at 1282. A narrow interpretation will "avoid unreasonably eliminating employer discretion in discharging employees." *Ryan*, 350 Utah Adv. Rep. at 6, 972 P.2d at 405.

"[N]ot every employment termination that has the effect of violating some public policy is actionable." *Fox*, 931 P.2d at 860. "[E]ven those principles which are widely held values may not be sufficient to justify wrongful termination recovery." *Berube*, 771 P.2d at 1043. Furthermore, this court "will appl[y] only those [public policy] principles which are so substantial and fundamental that there can be virtually no question as to their importance for promotion of the public good." *Id.*

■ "A public policy is 'clear' only if plainly defined by legislative enactments, constitutional standards, or judicial decisions." *Ryan*, 350 Utah Adv. Rep. at 6, 972 P.2d at 405. Whether a public policy is substantial is determined "by 'examin[ing] the strength of the policy as well as the extent to which it affects the public as a whole' and by determining whether we would allow an employer and an employee to nullify the policy by express agreement." *Id.* at 7, 972 P.2d at 406 (quoting *Retherford*, 844 P.2d at 966 n. 9).

■ "Legitimate reliance on a public policy exception to the at-will rule requires an attempt to identify the proper sources of public policy and the principles which underlie it." *Berube*, 771 P.2d at 1042–43. Public policies may be found in legislative enactments, judicial pronouncements, or the constitution. *See Ryan*, 350 Utah Adv. Rep. at 6, 972 P.2d at 405; *Berube*, 771 P.2d at 1043. Here, the trial court relied on the following in support of its conclusion that a clear and substantial public policy existed: "Article I, Section 1 of the Utah Constitution[;] Article I, Section 27 of the Utah Constitution[;] 42 U.S.C. §§ 3058g(a)(3) and (5)[;] *Utah Code Ann.* §§ 62A–3–201, et seq.[;] 42 U.S.C.

§ 1396[r(c)(6);] *Utah Admin. Code* § R432–150–4[; and] 42 C.F.R. § 483.10."

After closely scrutinizing the constitutional, statutory (both federal and state), and administrative "policies" cited by the trial court in support of its conclusion, we fail to see a clear and substantial public policy that care facility employees are required to tell the residents of personal monies arriving at the facility. The two state constitutional provisions in no way mention any type of financial rights of nursing home residents. The trial court also cites to parallel ombudsman provisions in both the United States Code and the Utah Code. However, Rackley does not claim that she was an ombudsman, nor do these provisions address the right of a nursing home resident to be told of incoming funds.

Lastly, 42 U.S.C.A. § 1396r(c)(6), 42 C.F.R. § 483.10, and Rule 432–150–9 of the Utah Administrative Code generally parallel each other and address the right of a nursing home resident to manage his or her own funds, as opposed to being required to deposit the funds with the facility. These three sections then address the facility's responsibility where funds are managed by the facility and would apply to the case at bar only if Muriel had given Fairview written authorization to manage her financial affairs. This clearly was not the case. Furthermore, these three sections at most simply require that when a nursing facility has been charged with managing the resident's personal funds, the facility must provide the resident with an accounting *only when requested by the resident.* *See* 42 U.S.C.A. § 1396r(c)(6)(B)(ii) (West Supp.1998); Health Care Financing Administration, 42 C.F.R. § 483.10(c)(4)(ii) (1996); Utah Admin. Code R432–150–9(8)(c)(ii) (Supp. Oct. 1, 1997). These sections do not place an affirmative duty upon facility employees to tell residents when personal funds have arrived, particularly where the resident had authorized a third party to "assist [her] in managing [her] personal needs allowance funds" and those funds were deposited in the resident's personal account.

The only language in these sections that may even remotely suggest a policy of notification of fund arrival, let alone one of "overarching importance to the public," *Retherford,* 844 P.2d at 966 n. 9, is found both in 42 C.F.R. § 483.10(c) and Rule 432–150–9(8) of the Utah Administrative Code. The Code of Federal Regulations provides that "[t]he resident has the right to manage his or her financial affairs, and the facility may not require residents to deposit their personal funds with the facility." 42 C.F.R. § 483.10(c). Rule 432–150–9(8) provides, "The resident has the right to maintain his financial affairs and the facility may not require a resident to deposit his personal funds with the facility." Utah Admin. Code R432–150–9(8) (Supp.1997). Taken in context, however, both of these provisions merely mandate that the nursing home facility cannot require a resident to deposit personal funds with that facility, but must instead allow the residents to manage their own finances. Construing the language narrowly, as we are required to do, we decline to interpret it as providing a clear and substantial public policy of overarching importance to the public as a whole requiring care facility employees to tell a resident about personal incoming funds. At most, failure to notify Muriel of the arrival of funds in this context implicated a personal, perhaps moral, obligation to Muriel.

## CONCLUSION

After careful review, we conclude that none of the constitutional, legislative, or administrative enactments relied upon by the trial court express a clear and substantial public policy requiring a care facility employee to tell a resident about personal funds that have arrived at the facility. We thus hold that Rackley's wrongful discharge claim premised upon the violation thereof fails. The trial court's judgment in favor of Rackley is reversed and the case is remanded to the trial court for entry of judgment in favor of Fairview.

WILKINS, Associate P.J., concurs.

GREENWOOD, Judge (concurring in the result):

I concur in the result reached by my colleagues, but respectfully disagree with their

means of achieving that result. The majority concludes that Rackley failed to satisfy the requirement of *Ryan*, that "a clear and substantial public policy existed." *Ryan v. Dan's Food Stores, Inc.*, 350 Utah Adv. Rep. 3, 6, 972 P.2d 395, 405 (Utah 1998) (citations omitted). Although I believe the trial court correctly held that an important public policy was at issue, I do not agree that Rackley's conduct brought "the policy into play," as required by *Ryan*. *Id*.

In *Berube v. Fashion Centre, Ltd.*, 771 P.2d 1033, 1042–43 (Utah 1989), the Utah Supreme Court observed that "a precise definition of public policy may be virtually impossible[,]" but is usually grounded in legislation or judicial decisions. In order for public policy to provide an exception to at-will employment, it must be both "*substantial* and *important.*" *Id*. at 1043 (emphasis in original).

After examining the sources of public policy cited by the trial court, the majority concludes that there is not "a clear and substantial public policy that care facility employees are required to tell the residents of personal monies arriving at the facility." I read at least two of those sources differently. Title 62A, chapter 3 of the Utah Code, titled Aging and Adult Services, creates the Division of Aging and Adult Services (Utah Code. Ann. §§ 62A–3–102 (1997)), and establishes a Long–Term Care Ombudsman Program. *Id*. § 62A–3–201 to –208 (1997 & Supp.1998). The ombudsman is intended to address "problems relating to long-term care for aging citizens, and to fulfill federal requirements." *Id*. § 62A–3–201. The statute further states:

> The Legislature finds and declares that the aging citizens of this state should be assisted in asserting their civil and human rights as patients, residents, and clients of long-term care facilities created to serve their specialized needs and problems; and that for the health, safety, and welfare of these citizens, the state should take appropriate action through an adequate legal framework to address their difficulties.

*Id*.

Consistent with this policy, the Utah Administrative Code prohibits a care facility from requiring a resident to deposit funds with it, but prefaces that prohibition with the statement, "A resident has the right to maintain her financial affairs." Utah Admin. Code R4.400.

In my opinion, the Utah Legislature has enunciated an important public policy that elderly persons in long-term care facilities should not be deprived of their right to be informed about and manage their financial affairs absent a proper determination of lack of competency. The trial court, in its oral ruling, identified the public policy as "the right of residents to know what their property is, whether it's financial or otherwise, to have a determination, a say in what happens to that property." I agree.

I do not believe, however, that Rackley met her burden of showing "that the employee's conduct brought the policy into play." *Ryan*, 350 Utah Adv. Rep. at 6, 972 P.2d at 405. The facts of this case are somewhat similar to those in the *Ryan* case. There, a pharmacist was fired for aggressive questioning of customers seeking to fill prescriptions. The supreme court upheld the pharmacist's termination, because the law prohibiting a pharmacist from "knowingly filling an improper prescription," did not require the pharmacist to question or investigate. *Id*. at 8, 972 P.2d at 406. The court stated that the firing of the pharmacist would only be actionable if it was based upon the reporting of criminal activity to the proper authorities or the questioning of prescriptions as required by law. *See id*. at 9, 972 P.2d at 409.

In this case, Rackley responded to what she perceived as improper practices by contacting both the resident, Muriel, and Muriel's daughter-in-law, Sharon. She did not speak with the owners of the facility and it was not until after she was fired that she contacted the state ombudsman responsible for investigating and acting on such matters. Interestingly, the owners apparently agreed with her and clarified that residents should be informed of all deposits to their accounts. Therefore, I would conclude that Rackley's conduct did not further the public policy in

an appropriate manner and I would reverse the trial court's judgment on that basis.