2001 UT 32

**Cathleen L. RACKLEY, Plaintiff
and Petitioner,**

v.

**FAIRVIEW CARE CENTERS, INC.,
Defendant and Respondent.**

No. 990044.

Supreme Court of Utah.

April 6, 2001.

Rehearing Denied May 21, 2001.

Peter C. Collins, Tara L. Isaacson, Salt Lake City, for plaintiff.

Danny Quintana, Salt Lake City, for defendant.

On Certiorari to the Utah Court of Appeals

HOWE, Chief Justice:

## INTRODUCTION

¶ 1 We granted certiorari to review the decision of the court of appeals holding that defendant did not violate a clear and substantial public policy when it terminated plaintiff's employment. *See Rackley v. Fairview Care Ctrs., Inc.,* 970 P.2d 277, 282 (Utah Ct.App.1998).

## BACKGROUND

¶ 2 On November 1, 1993, plaintiff Cathleen L. Rackley began working as an at-will employee for defendant Fairview Care Centers, Inc., as the administrator of a nursing home known as Fairview West. In that capacity, she made suggestions to management and took steps to bring the care facility into compliance with both federal and state law. For example, plaintiff implemented changes in payroll so that if a payday fell on a weekend or holiday, employees would be paid the first prior working day. Additionally, she informed employees that by law they were entitled to a Hepatitis B vaccination at Fairview's expense. Plaintiff also instituted changes in employee scheduling, food service, laundry service, and in the basic cleanliness, organization, and efficiency of Fairview West.

¶ 3 Sometime in February 1994, Karleen Merkley, the manager responsible for resident funds at Fairview West, informed most of the members of the staff that a check for $720 from the Veteran's Administration was expected to arrive for resident Ms. Mellen, and that Ms. Mellen was not to be notified when it came. Plaintiff was not informed of that prohibition. Sharon Mellen, Ms. Mellen's daughter-in-law who had been aiding Ms. Mellen in managing her financial affairs for many years, had requested that Ms. Mellen not be told about the money because she feared Ms. Mellen would try to use it to move out of Fairview West and attempt to live on her own. Sharon wanted to inform Ms. Mellen of the check's arrival personally and to convince her to use the money to purchase a new wheelchair.

¶ 4 In the latter part of February, upon notification that the check had arrived, Sharon went to Fairview West, signed an authorization form in the presence of a witness, and took the check and deposited it in Ms. Mellen's personal bank account.[1] Soon thereafter, plaintiff became aware that the check had arrived and had been picked up by Sharon. She notified Ms. Mellen of that fact. Ms. Mellen was upset that she had not been informed of the check's arrival or subsequent deposit and consequently requested that plaintiff contact Sharon on her behalf.

¶ 5 There is some dispute about the content of the phone call to Sharon. Plaintiff contends that she simply told Sharon she had notified Ms. Mellen of the arrival of the check and expressed concern about the impropriety of keeping the information from Ms. Mellen. Plaintiff asserts that Sharon "screamed" at her for telling Ms. Mellen about the money because "she was promised that nobody would find out about the money, that Karleen had talked to her and nobody should find out about it." Sharon contends that plaintiff called her at her place of work, yelled at her over the phone, and accused her

---

1. While Ms. Mellen had not signed over full control of her funds to Sharon, Sharon had signature authority on Ms. Mellen's account. Sharon did not have power of attorney over Ms. Mellen's funds before or during the events in question. Ms. Mellen had signed a document stating: "To whom it may concern, I hereby certify that Sharon Mellen has authorization to assist me in managing my personal needs allowance funds." The document had originally provided that "Fairview Care Center" was to assist Ms. Mellen in her financial matters, but had been crossed out to read "Sharon Mellen" instead. We would be faced with a different situation had Ms. Mellen given written authorization to Fairview to manage her money, as both federal and state laws provide guidelines for managing resident monies.

of dishonesty and improper conduct. She stated, "[a]ll she did was kept telling me, you're stealing Ms. Mellen's money, you can't do that, you need to turn it—return the money to Fairview West.... She was very unprofessional. She had me in tears." Plaintiff did not then notify Joseph Peterson, owner and general manager of Fairview, of what had transpired or request investigation by any outside authority.[2]

¶ 6 Shortly thereafter, Sharon contacted Peterson and told him her version of what had happened. Peterson then arranged a meeting with plaintiff, Merkley, and Sallie Maroney (the manager of Fairview East) to discuss the incident. At that meeting, Merkley and Maroney received written reprimands for failing to tell Ms. Mellen about the check, and a new official policy was instituted requiring that residents be informed of all their incoming funds, regardless of who assisted them with their financial affairs. Plaintiff was reprimanded for calling Sharon at work. Peterson said he would arrange an appointment with Sharon, Maroney, plaintiff, and himself to discuss the incident. The meeting was then adjourned.

¶ 7 Days later, Peterson again called plaintiff into a meeting where he indicated that he was considering terminating her over the Mellen incident. While there is some confusion over what happened next, the parties have stipulated that for purposes of this case, plaintiff was terminated by Fairview.[3] Rackley filed this action, claiming she was wrongfully discharged in violation of public policy.

¶ 8 After a bench trial, the court held that a clear and substantial public policy of notifying care facility residents of the arrival of their funds had been implicated and that notifying Ms. Mellen and contacting Sharon were actions furthering such policy. On appeal, the court of appeals reversed the trial court's judgment, holding that notifying care facility residents of the arrival of their personal funds is not required by any clear and substantial public policy, and therefore, terminating plaintiff was within Fairview's dis-

cretion under the employment-at-will doctrine. *See Rackley,* 970 P.2d at 282. We granted certiorari. This court has jurisdiction over this matter pursuant to section 78–2–2(3)(a) of the Utah Code.

## ANALYSIS

¶ 9 The parties dispute the precise issue before us. Fairview contends that the key issue is whether notification to care center residents of the arrival of their personal funds is a clear and substantial public policy. Plaintiff disagrees and asserts that the policy at issue is not the extremely narrow policy of notifying residents of the arrival of their funds, but the broader right of residents to manage their own financial affairs. Plaintiff asserts that the court of appeals's narrow interpretation of the policy at issue erroneously requires that "all the specifics of a given employment termination scenario would have to be *most specifically anticipated* by constitutional provision, statute, or regulation in order [for] a claim for wrongful termination for violation of public policy [to] succeed."

¶ 10 We have held in the past that "[l]egitimate reliance on a public policy exception to the at-will rule requires an attempt to identify the proper sources of public policy and the principles which underlie it." *Berube v. Fashion Ctr., Ltd.,* 771 P.2d 1033, 1042–43 (Utah 1989). We agree with plaintiff that if we were to require the law to be so specifically tailored, the public policy exception would be meaningless. Thus, we hold that the proper issue before us is whether a care facility resident's right to manage her own funds constitutes a clear and substantial public policy.

¶ 11 On certiorari, we review the decision of the court of appeals, not that of the trial court. *See Lysenko v. Sawaya,* 2000 UT 58, ¶ 15, 7 P.3d 783. Whether a clear and substantial public policy exists supporting a wrongful discharge claim based on an employer's violation of that policy is a ques-

---

2. After her termination, Rackley contacted the Utah Department of Heath and Safety and the Office of the Ombudsman about the situation.

3. Conflicting testimony was given at trial as to whether Peterson fired plaintiff or whether he changed his mind and decided to keep her as the Fairview West administrator and she quit.

tion of law. We review the court of appeals's conclusions of law for correctness and afford them no deference. *See Bear River Mut. Ins. Co. v. Wall*, 1999 UT 33, ¶ 4, 978 P.2d 460.

¶ 12 Under Utah law, an employment relationship entered into for an indefinite period of time is presumed to be at-will and gives rise to a contractual arrangement where the employer or the employee may terminate the employment for any reason, except as provided by law. *See Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 400 (Utah 1998); *Fox v. MCI Communications Corp.*, 931 P.2d 857, 859 (Utah 1997); *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 53–55 (Utah 1991); *Berube*, 771 P.2d at 1044; *Bihlmaier v. Carson*, 603 P.2d 790, 792 (Utah 1979). Both parties in this case agree that plaintiff was an at-will employee of Fairview. Thus, under ordinary circumstances, plaintiff could have been terminated for any reason and at any time.

¶ 13 However, there are exceptions to the at-will presumption. An at-will employee may overcome the at-will presumption by showing: " '(1) there is an implied or express agreement that the employment may be terminated only for cause or upon satisfaction of another agreed-upon condition; (2) a statute or regulation restricts the right of an employer to terminate an employee under certain conditions; or (3) the termination of employment constitutes a violation of a clear and substantial policy.' " *Burton v. Exam. Ctr. Indus. & Gen. Med. Clinic, Inc.*, 2000 UT 18, ¶ 6, 994 P.2d 1261 (quoting *Fox*, 931 P.2d at 859); *see also Ryan*, 972 P.2d at 400; *Retherford v. AT & T Communications*, 844 P.2d 949, 958–59 (Utah 1992) (implied or express agreement and public policy exceptions); *Heslop v. Bank of Utah*, 839 P.2d 828, 836–38 (Utah 1992) (implied or express agreement exception); *Peterson v. Browning*, 832 P.2d 1280, 1281 (Utah 1992) (public policy exception); *Hodges v. Gibson Prods. Co.*, 811 P.2d 151, 165 (Utah 1991) (same). "[E]mployers have a duty not to terminate any employee, 'whether the employee is at-will or protected by an express or implied employment contract,' in violation of a clear and substantial public policy." *Ryan*, 972

P.2d at 404 (quoting *Retherford*, 844 P.2d at 960). If an employer breaches this duty, the terminated employee has a cause of action in tort against the employer. *See Ryan*, 972 P.2d at 404; *Fox*, 931 P.2d at 860; *Retherford*, 844 P.2d at 959; *Peterson*, 832 P.2d at 1283–86.

¶ 14 To succeed on a wrongful discharge claim for violation of such a public policy, plaintiff must satisfy a four-pronged test. Plaintiff must prove that (1) her employment was terminated; (2) a clear and substantial public policy existed; (3) the plaintiff's conduct implicated that clear and substantial public policy; and (4) the termination and conduct in furtherance of the public policy are causally connected. *See Ryan*, 972 P.2d at 404; *Heslop*, 839 P.2d at 837; *Wilmot v. Kaiser Aluminum & Chem. Corp.*, 118 Wash.2d 46, 821 P.2d 18, 28–29 (1991). Because Fairview concedes for purposes of this case that plaintiff was terminated, we move directly to the second prong.

## I. CLEAR AND SUBSTANTIAL PUBLIC POLICY

¶ 15 The public policy exception to the employment at-will presumption is much narrower than traditional notions of public policy. *See Ryan*, 972 P.2d at 405. Only "clear and substantial public policies will support a claim of wrongful discharge in violation of public policy." *Ryan*, 972 P.2d at 404; *see also Peterson*, 832 P.2d at 1282. The nature and scope of what constitutes a "clear and substantial" public policy, however, is not always easily discernible. *See, e.g., Patton v. United States*, 281 U.S. 276, 306, 50 S.Ct. 253, 74 L.Ed. 854 (1930) ("The truth is that the theory of public policy embodies a doctrine of vague and variable quality . . . ."). "In Utah, we have frequently invoked the concept of public policy without articulating precisely its origin or definition." *Berube*, 771 P.2d at 1042; *see also Fox*, 931 P.2d at 860 (stating that "a more precise definition of the term must await the time when this Court has had sufficient experience with a number of cases"); *Peterson*, 832 P.2d at 1282 ("The identification of clear and sub-

stantial public policies will require case-by-case development.").

¶ 16 Our prior cases in this area provide us with some general governing principles. We have stated that a public policy is "clear" if it is plainly defined by one of three sources: (1) legislative enactments; (2) constitutional standards; or (3) judicial decisions. *See Dixon v. Pro Image Inc.*, 1999 UT 89, ¶ 31, 987 P.2d 48 (citing *Ryan*, 972 P.2d at 405); *Hodges*, 811 P.2d at 165–66; *see also Burton*, 2000 UT 18 at ¶ 6, 994 P.2d 1261 (stating that "declarations of public policy can be found in constitutions and statutes"). For example, we have held that the enforcement of a state's criminal code that reflects Utah policy constitutes a clear and substantial public policy. *See Peterson*, 832 P.2d at 1283 (holding that employer who fired employee for refusing to feloniously provide false information on tax forms could be held liable for wrongful termination); *Hodges*, 811 P.2d at 166–68 (holding that discharged employee had action for wrongful termination where employee was fired for refusing to accede to extortionate demands by employer).

 ¶ 17 We have also held that a public policy is "substantial" if it is of "overreaching importance to the public, as opposed to the parties only." *Ryan*, 972 P.2d at 405. "[W]e must . . . inquire whether the discharge is against public policy and affects a duty which inures to the benefit of the public at large rather than to a particular employer or employee." *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 254 Cal.Rptr. 211, 765 P.2d 373, 379 (1988); *see, e.g., Fox*, 931 P.2d at 861–862 (holding that retaliatory termination for reporting possible criminal conduct of co-workers to employer does not give rise to a violation of substantial public policy). Statutes that simply regulate conduct between private individuals or impose requirements whose fulfillment does not implicate fundamental public policy concerns are not sufficient to require an exception to the at-will presumption. *See id.* As we stated in *Ryan*:

> First, one must ask whether the policy in question is one of overarching importance to the public, as opposed to the parties only. Second, one must inquire whether

the public interest is so strong and the policy so clear and weighty that we should place the policy beyond the reach of contract, thereby constituting a bar to discharge that parties cannot modify, even when freely willing and of equal bargaining power.

972 P.2d at 405.

 ¶ 18 It is important to note, however, that "not every employment termination that has the effect of violating some public policy is actionable." *Fox*, 931 P.2d at 860. "[E]ven those principles which are widely held values may not be sufficient to justify wrongful termination recovery." *Berube*, 771 P.2d at 1043. This court " 'recognizes the importance of keeping the scope of the public policy exception narrow to avoid unreasonably eliminating employer discretion in discharging employees.' " *Dixon*, 1999 UT 89 at ¶ 31, 987 P.2d 48 (quoting *Ryan*, 972 P.2d at 405); *see also Peterson*, 832 P.2d at 1285–86 (Howe, A.C.J., concurring) (" 'The public policy exception is narrow enough in its scope and application to be no threat to employers who operate within the mandates of the law. . . . Such employers will never be troubled.' "). We have held, and continue to ensure, that "public policies [are construed] narrowly and will [protect] only those principles which are so substantial and fundamental that there can be virtually no question as to their importance for promotion of the public good." *Berube*, 771 P.2d at 1043.

 ¶ 19 "Legitimate reliance on a public policy exception to the at-will rule requires an attempt to identify the proper sources of public policy and the principles which underlie it." *Id.* at 1042–43. The court of appeals found that the following constitutional and statutory provisions did not provide grounds for a finding of clear public policy: (1) article I, sections 1 and 27 of the Utah Constitution; (2) federal and state ombudsman provisions provided in 42 U.S.C. § 3058g(a)(3) and (5) and sections 62A–3–201 to –202 of the Utah Code; and (3) 42 U.S.C. § 1396r(c)(6), R432–150–4 of the Utah Administrative Code, and 42 C.F.R.

§ 483.10.[4] We address each in turn.

### A. Article I, Sections 1 and 27 of the Utah Constitution

 ¶ 20 Plaintiff first asserts that two provisions in the Utah Constitution form the basis of a clear public policy. Article I, section 1 of the Utah Constitution provides in pertinent part that "[a]ll men have the inherent and inalienable right to ... acquire, possess and protect property...." Article I, section 27 provides that "[f]requent recurrence to fundamental principles is essential to the security of individual rights and the perpetuity of free government." While these two provisions .do protect the right to acquire, possess, and protect property, they do not enunciate the narrow type of policy envisioned by our case law creating the public policy exception. The right of a care facility resident to manage her own funds is not "plainly defined by ... [these] constitutional standards." *Ryan*, 972 P.2d at 405.

### B. 42 U.S.C. § 3058g(a)(3) and (5), and Utah Code Ann. §§ 62A–3–201 to –208

¶ 21 Next, plaintiff contends that 42 U.S.C. § 3058g(a)(3) and (5), and sections 62A–3–201 to –208 of the Utah Code also plainly define such a public policy.[5] Plaintiff specifically points to subsections (a)(3)[6] and (a)(5)[7] in support of her position. However, subsections (a)(3) and (a)(5) are devoid of any language relating to a resident's right to manage her funds. While these provisions broadly discuss the duty of the ombudsman to monitor and protect the rights of care facility residents, they in no way state a narrow and clear public policy necessary for an exception to the at-will rule. This statute governs the duties and functions of the office of the ombudsman and its representatives and entities, and in no way enunciates rights of care facility residents.

¶ 22 Similarly, we find sections 62A–3–201 and –202 of the Utah Code unavailing. The stated purpose of these provisions "is to establish within the division [of Aging and Adult Services] the [Utah] long-term care ombudsman program for the aging ... and identify duties and responsibilities of that program ... in order to address problems relating to long-term care." Utah Code Ann. § 62A–3–201 (2000). In pertinent part, the ombudsman is to address the difficulties of the aging citizens of the state by assisting in asserting their civil and human rights as residents of care facilities through legal

---

**4.** The provisions referred to in this opinion are in their most current form, as they have not been substantially altered since the commencement of this action.

Additionally, plaintiff asserts that we should consider 42 U.S.C. § 1395i–3(c)(6) in making our determination. This provision was not addressed by either the trial court or the court of appeals, and plaintiff has failed to brief why we should consider it on this review. Rule 24 of the Utah Rules of Appellate Procedure provides that the brief of the appellant "shall contain the contentions and reasons of the appellant with respect to the issues presented...." Utah R.App.P. 24(a)(9). Issues that do not comply with our briefing rules may be disregarded. *See MacKay v. Hardy*, 973 P.2d 941, 949 (Utah 1998). Regardless, we do not believe this section presents any information not already contained within the sections properly before us. We therefore address only those sections addressed by the trial court and court of appeals.

**5.** In general, 42 U.S.C. § 3058g provides that in order to receive federal funding for state long-term care ombudsman programs, states must meet certain requirements, including appointing an ombudsman and establishing an official office of the ombudsman. *See* 42 U.S.C. § 3058(a)(1), (2).

**6.** Subsection (a)(3) provides in relevant part the functions of the ombudsman. Under this subsection, the ombudsman is to provide services to assist care facility residents in protecting their rights and investigate complaints as to actions and decisions that may adversely affect the rights of residents by long-term care providers. *See* 42 U.S.C. § 3058g(a)(3)(A)(ii)(I), (a)(3)(B). The ombudsman is also to monitor and analyze developments under both state, federal, and local laws that pertain to the rights of care facility residents. *See* (a)(3)(G)(i).

**7.** Subsection (a)(5) provides in relevant part that individuals designated as local ombudsman entities or representatives are to provide services to protect the health, safety, welfare, and rights of residents, *see* (a)(5)(B)(i), identify and investigate complaints made by or on behalf of residents that relate to actions or decisions that may affect the rights of residents, *see* (a)(5)(B)(iii), and review and comment upon existing or proposed laws or regulations that pertain to the rights and well-being of residents, *see* (a)(5)(B)(v).

means. *See id.* We similarly find this language too broad to constitute a clear and substantial specific public policy.

### C. 42 U.S.C. § 1396r(c)(6), Utah Admin. Code R432–150–4 and 42 C.F.R. § 483.10

¶ 23 Next, plaintiff contends that 42 U.S.C. § 1396r(c)(6), R432–150–4 of the Utah Administrative Code and 42 C.F.R. § 483.10 provide a clear basis for her public policy claim. First, 42 U.S.C. § 1396r, which governs the requirements care facilities must meet to obtain grants for medical assistance programs, provides that "[t]he nursing facility ... may not require residents to deposit their personal funds with the facility." 42 U.S.C. § 1396r(c)(6)(A)(i). Subsection (c)(6) includes guidelines for how care facilities are to manage resident funds when management of such funds has been authorized by the resident. Although not clearly stated, this section could imply that care facility residents have the right to manage their own financial affairs. In the past we have held that we may look beyond the provision in question to determine whether the motivating policy behind it constitutes a clear and substantial public policy. *See, e.g., Heslop,* 839 P.2d at 837 (finding that the "general" purposes of the Utah Financial Institutions Act constitute a clear and substantial public policy). However, we conclude that a mere hint to such an underlying policy, as is the case here, is insufficient to constitute the type of clear and substantial policy necessary to establish an exception to the employment-at-will doctrine. Thus, we hold that 42 U.S.C. § 1396r(c)(6) does not rise to the level of a clear public policy.

¶ 24 Rule 432–150–4.400 of the Utah Administrative Code provides that "[t]he resident has the right to maintain his financial affairs and the facility may not require a resident to deposit his personal funds with the facility." Utah Admin. Code R32–150–4.400 (1994). Both of these sections plainly state that care facility residents have the right to manage their own finances.

¶ 25 Additionally, 42 C.F.R. § 483.10, governing resident rights that must be recognized by long-term care facilities, provides

the most detailed and applicable provision. It states:

> The resident has a right to a dignified existence, self-determination, and communication with and access to persons and services inside and outside the facility. A facility must protect and promote the rights of each resident, including ... the right to manage his or her financial affairs, and the facility may not require residents to deposit their personal funds with the facility.

42 C.F.R. § 483.10(c). This regulation explicitly states that care facility residents have the right to manage their own funds.

¶ 26 However, we have earlier pointed out that a clear public policy must be found in our statutes or constitutions, *see Burton,* 2000 UT 18 at ¶ 6, 994 P.2d 1261; *Peterson,* 832 P.2d at 1282; *Hodges,* 811 P.2d at 165–66; *Berube,* 771 P.2d at 1043, or judicial decisions, *see Hodges,* 811 P.2d at 165; *Berube,* 771 P.2d at 1043. The provision in 42 C.F.R. § 483.10 is an executive agency regulation that governs practice and procedure before federal administrative agencies. Similarly, R432–150–4.400 is a provision in the Utah Administrative Code.

¶ 27 Administrative regulations by their very nature are not "substantial" under our case law. The character of the public policy exception is that it furthers policies that "protect the public or promote public interest." *Berube,* 771 P.2d at 1043. Agency regulations are created by the agencies themselves and are tailored to govern specific agency needs. The public policy exception must be " 'narrow enough in its scope and application to be no threat to employers who operate within the mandates of the law and clearly established public policy as set out in the duly adopted laws.' " *Peterson,* 832 P.2d at 1285 (Howe, A.C.J., concurring) (citation omitted). Thus, we hold that while 42 C.F.R. § 483.10 and R432–150–4.400 of the Utah Administrative Code expressly state that care facility residents have the right to manage their own funds, our case law does not allow for administrative regula-

tions alone to constitute expressions of clear public policy.[8]

¶ 28 In so holding, we recognize that care facility residents are often at the mercy of the facilities in which they reside. Residents face many challenges as their mobility decreases and their ability to take care of themselves physically, mentally, and emotionally deteriorates. However, while we agree with plaintiff that "[t]he rights of nursing home residents, especially with the increasing longevity of Utah residents and the growth of Utah's population, are a matter of most significant public concern," we also recognize the reality that many residents, while remaining in control of their funds, voluntarily seek the assistance of family members or friends with their banking and spending decisions. That appears to have been the situation in the instant case. Such efforts by honest and helpful advisors should be encouraged and not discouraged by rigid, government-imposed requirements.

## II. CONDUCT IMPLICATING A CLEAR AND SUBSTANTIAL PUBLIC POLICY

¶ 29 Because we do not find that a clear public policy has been enunciated by statute, constitutional provision, or judicial decision, we need not address whether plaintiff in notifying Ms. Mellen of the arrival of her funds, or calling Sharon at work and questioning the propriety of her removing those funds from Fairview West, constituted conduct in furtherance of that policy. Neither need we determine whether such conduct was causally related to plaintiff's termination. Thus, defendant did not violate the law in terminating plaintiff because of her involvement in the Mellen incident.

## CONCLUSION

¶ 30 After careful review, we hold that defendant did not violate a clear public policy in terminating plaintiff's employment. We therefore affirm the court of appeals.

8. We do not hold that an administrative regulation may not provide support to a legislatively or

¶ 31 Associate Chief Justice RUSSON, Justice DURRANT, and Judge EYRE concur in Chief Justice HOWE'S opinion.

¶ 32 Having disqualified himself, Justice WILKINS does not participate herein; District Judge Donald EYRE, Jr. sat.

DURHAM, Justice, dissenting:

¶ 33 I respectfully dissent. There is, I believe, abundant support for the proposition that a long-term care facility resident's right to manage her own funds is a matter of clear and substantial public policy. We are dealing here with one of our system's most fundamental and well-understood rights: the right of a legally competent person to control her property and manage her financial affairs.

¶ 34 This right is so fundamental and well-understood that it has not in fact been elaborated extensively in our constitution or legislative enactments; instead, it is a "given," a predicate for numerous related policies and protections in the law. These policies are reflected in the Utah Administrative Code, in federal statutes and regulations, in the Utah Probate and Criminal Code, in our own decision in *In re Guardianship of Valentine*, 4 Utah 2d 355, 294 P.2d 696 (1956), and in section 1 of the Utah Constitution.

¶ 35 This court has stated that public policy is "clear" when it is plainly defined in one of the following sources: (1) legislative enactments, (2) constitutional standards, or (3) judicial decisions. *See Ryan v. Dan's Food Stores*, 972 P.2d 395, 405 (Utah 1998). In *Berube v. Fashion Centre Ltd.*, 771 P.2d 1033, 1043 (Utah 1989), the source of this trilogy, this court stated:

[W]e will construe public policies narrowly and will *generally utilize* those based on prior legislative pronouncements or judicial decisions, applying only those principles which are so substantial and fundamental that there can be virtually no

judicially created public policy.

question as to their importance for the promotion of public good.

*Id.* (emphasis added).

¶ 36 In *Berube* this court adopted for the first time a public policy exception to the at-will employment rule. We expressed caution about the limits of the exception and therefore identified possible sources of public policy that were unquestionably legitimate. *Berube*, however, was not intended to create an exclusive list of all possible sources as the language above reflects. Rather, it was an attempt to ensure that this court deferred to legitimate sources of public policy in the broader community instead of having a free rein to "invent" public policy on its own.

¶ 37 Three years after *Berube*, in *Peterson v. Browning*, 832 P.2d 1280 (Utah 1992), we explored the issue further:

> We will not attempt here to define the full scope of the term "public policy" for the purposes of the exception to the at-will doctrine.... [T]he public policy exception applies in this state when the statutory language expressing the public conscience is clear and when the affected interests of society are substantial. The identification of clear and substantial public policies will require *case-by-case* development.

*Id.* at 1282 (emphasis added).

¶ 38 This court is now faced with the question of whether to recognize a public policy exception protecting the right of a legally competent long-term care facility resident to manage her own financial affairs. I believe that the majority's view of the legitimacy of the public policy in question is mistaken. We can, and should, recognize administrative regulations as a valid source of Utah public policy for exceptions to the at-will employment doctrine; the regulatory process occurs through legislative delegation and under legislative oversight. It is undertaken by persons and entities with considerable expertise and knowledge regarding legislative intent. Furthermore, there is clear and substantial public policy supporting a long-term care facility resident's right to manage her funds in related federal regulations identical to those adopted by this state, in the Utah Probate and Criminal Code, in Utah case law, and in the Utah Constitution.

## I. UTAH ADMINISTRATIVE CODE RULE 432–270–19(1) & RULE 432–270–10(5)(s)

¶ 39 Rule 432–270–10(5)(s) of the Utah Administrative Code expressly sets forth the rights of long-term care facility residents. Among other rights, residents are granted "the right to manage and control personal funds, or to be given accounting of personal funds entrusted to the facility." Utah Admin.Code R432–270–10(5)(s). The Utah Administrative Code further states, "[r]esidents have the right to manage and control their financial affairs. The Facility may not require residents to deposit their personal funds or valuables with the facility." Utah Admin.Code R432–270–19(1).

¶ 40 The majority opinion acknowledges this language but fails to regard it as an expression of public policy because "administrative regulations by their very nature are not 'substantial.'" First, I disagree with the notion that the administrative regulatory process is, by definition, not substantial. More importantly, however, it is the content of the regulation that should be examined for substance, not merely its location in statutory or regulatory language. Ignoring administrative regulations merely because they are not "legislative enactments" overlooks the reality of the process of statutory delegation to administrative agencies and the hugely significant role that administrative regulation plays in our economy and society.

¶ 41 Other states have recognized administrative regulations as a legitimate source of public policy. Recently, the California Supreme Court held that administrative regulations could be a source of fundamental public policy exceptions to the at-will employment doctrine. *See Green v. Ralee Eng'g Co.*, 19 Cal.4th 66, 78 Cal.Rptr.2d 16, 960 P.2d 1046 (1998). In *Green*, the California Supreme Court explained:

> [O]ne of the primary reasons for requiring the public policy that gives rise to a wrongful termination action to have a basis in either constitutional or statutory provisions is to limit judicial policymaking lest [courts] mistake their own predilections for

public policy which deserves recognition at law. . . . [W]hen courts discover public policy in regulations enacted under statutory authority, they are not mistak[ing] their own predilections for public policy, but rather are recognizing a public policy that the Legislature has formulated and the executive branch has implemented.

*Id.* at 1054 (alteration in original) (internal quotations and citation omitted).

¶ 42 Other states have accepted administrative regulations as a source of public policy. *See Saffels v. Rice,* 40 F.3d 1546, 1550 (8th Cir.1994) ("An at-will employee may state a claim under Missouri's public policy exception when an employer's act of discharging the employee is violative of a statute, a regulation based on a statute, or a constitutional provision."); *Adolphsen v. Hallmark Cards, Inc.,* 907 S.W.2d 333, 337 (Mo.Ct.App.1995) (stating that regulations governing public policy will often relate to a clear mandate of public policy); *Pierce v. Ortho Pharm. Corp.,* 84 N.J. 58, 417 A.2d 505, 512 (1980) ("The sources of public policy include legislation; administrative rules, regulations or decisions; and judicial decisions."); *Yetter v. Ward Trucking Corp.,* 401 Pa.Super. 467, 585 A.2d 1022, 1026 (1990) ("The sources of public policy . . . include legislation; administrative rules, regulation, or decision; and judicial decision." (citation omitted)).

¶ 43 This court should follow such well-reasoned authority and acknowledge administrative regulations as a legitimate source of public policy in Utah. Administrative regulations may in some cases be even more authoritative than statutory language because the agencies that draft them are more aware of the issues facing the organizations being regulated and the needs of individuals being protected. It is entirely clear, in my view, that the subject administrative regulations reflect the values of the state of Utah concerning the fundamental right to control one's property and to manage one's financial affairs when one is a competent resident of a long-term care facility.

II. 42 U.S.C. § 1396r(c)(6)
& 42 C.F.R. § 483.10

¶ 44 In addition to rule 432 of the Utah Administrative Code, we have further evidence of public policy in the virtually identical federal regulatory language enacted pursuant to 42 U.S.C § 1396r(c)(6). *See* 42 C.F.R. § 483.10. In *Peterson v. Browning,* 832 P.2d 1280 (Utah 1992), this court held that federal law, and even the law of other states, is a valid source of public policy:

Persons who are terminated from their employment because they refuse to engage in illegal activities that implicated clear and substantial Utah public policy considerations should be protected regardless of whether the applicable law is that of Utah, the federal government, or another state.

*Id.* at 1283. We required in *Peterson* that there be a connection between the Utah public policy and the law from another jurisdiction. "Although many state and federal laws will reflect Utah public policy, and may, in fact, provide a source of Utah public policy, a plaintiff must establish the connection between the law violated and the public policies of Utah." *Id.*

¶ 45 A review of the federal statutes and regulations concerning long-term care facility residents cited above establishes the connection between the federal regulations and the public policies of Utah. Under 42 U.S.C. § 1396r(c)(6), "[t]he nursing facility . . . may not require residents to deposit their personal funds with the facility." 42 U.S.C. § 1396r. Subsection (c)(6) of the statute gives long-term care facilities guidelines for managing residents' funds when the facilities are granted authority to do so. The underlying policy of 42 U.S.C. § 1396r(c)(6) is clearly to protect the rights of long-term care facility residents, including their right to manage their funds. There would be no reason for these guidelines without the fundamental premise that residents have the right to manage their own financial affairs. Contrary to the majority opinion, I believe this federal statute does more than "hint to such an underlying policy." Rather, the principle the statute embodies is so fundamental it requires no more explicit reference; it easily rises to the level of the clear and substantial

public policy necessary to establish an exception to the employment-at-will doctrine. Virtually no one—lawmaker, judge, or private citizen—would be willing to controvert the notion that competent persons cannot be deprived of their right to control their property, even if they live in a long-term care facility.

¶ 46 The language of the related regulation contained in 42 C.F.R. § 483.10 (identical to that in rule 432–270–19) is directly tied to the statutory purpose of 42 U.S.C. § 1396r. It states:

> A facility must protect and promote the rights of each resident, including ... [t]he resident has the *right to manage his or her financial affairs,* and the facility may not require residents to deposit their personal funds with the facility.

42 C.F.R § 483.10(c)(1) (emphasis added).

¶ 47 We made clear in *Peterson* that we will accept federal law when it has a connection to a Utah public policy or value. The connection is evidenced here by the nearly word-for-word replication of this federal rule by the Utah Administrative Code.[1]

### III. UTAH CODE ANN. § 75–5–401

¶ 48 Further support for the public policy in question is found in the Utah Probate Code. Section 75–5–401 deals with protective proceedings for minors and disabled persons. It states:

> (2) Appointment of conservator or other protective order may be made in relation to the estate and affairs of a person *if the court determines* that the person: (a) is unable to manage the person's property and affairs effectively for reasons such as mental illness, mental deficiency, physical illness or disability, chronic use of drugs, chronic intoxication, confinement, detention by a foreign power or disappearance; and (b) has property which will be wasted or dissipated unless proper management is provided or that funds are needed for the support, care and welfare of the person or those entitled to be supported by the per-

son and protection is necessary or desirable to obtain or provide funds.

Utah Code Ann. § 75–5–401(2)(a), (b) (emphasis added). This section provides a structure to ensure due process for allegedly disabled persons before they may lawfully be deprived of their right to control their property. This is clear evidence that the Utah legislature recognizes the right to control property as an important and fundamental value. This section explicitly protects the rights of all persons to manage their "property and affairs" unless and until they are determined by a court to be incompetent to do so. It is, in my view, an entirely adequate legislative source for the public policy ensuring the right to manage one's property.

### IV. UTAH CODE ANN. § 76–5–111

¶ 49 As the majority points out, we have held that prohibitions contained in our criminal code reflect public policy. *See Fox v. MCI Comm. Corp.,* 931 P.2d 857, 860 (Utah 1997). Section 76–5–111 of the Utah Code deals with the abuse, neglect, or exploitation of a disabled or elder adult. In part, it states:

> (4)(a) A person commits the offense of exploitation of a disabled or elder adult when the person: (i) is in a position of trust and confidence, or has a business relationship, with the disabled or elder adult and knowingly, by deception or intimidation, obtains or uses, or endeavors to obtain or use, the disabled or elder adult's funds, credit, assets, or other property with the intent to temporarily or permanently deprive the disabled or elder adult of the use, benefit, or possession of his property, for the benefit of someone other than the disabled or elder adult.

§ 76–5–111(4)(a)(i).

¶ 50 I do not suggest that this statute demonstrates that criminal conduct occurred in this case. It does, however, plainly criminalize acts that "temporarily or permanently deprive" an elder adult of the "use, benefit, or possession of his property." Utah Code

---

1. "Residents have the right to manage and control their financial affairs. The facility may not require residents to deposit their personal funds or valuables with the facility." Utah Admin.Code R432–270–19(1).

Ann. § 76–5–111(4)(a)(i). It is noteworthy that the criminal statute explicitly mentions "deception" as a prohibited means of depriving older persons of the "use, benefit, or possession" of their property. *Id.* Thus, this section provides a further illustration of the fact that the state of Utah has a well-defined public policy for the safeguarding of the property of older adults and their control thereof.

## V. IN RE GUARDIANSHIP OF VALENTINE

¶ 51 For over forty-five years, this court has recognized a citizen's right to control his or her financial affairs. In a case involving a petition for the appointment of a guardian of the property of an alleged incompetent, this court stated, "[t]he right of every individual to handle his own affairs even at the expense of dissipating his fortune is a *right jealousy guarded* and one which will not be taken away except in extreme cases." *In re Guardianship of Valentine,* 4 Utah 2d 355, 294 P.2d 696, 702 (1956) (emphasis added).

¶ 52 In this case, Sharon Mellen, Ms. Mellen's daughter-in-law, asked Ms. Merkeley, Fairview's management person in charge of residents' funds, not to inform Ms. Mellen of the arrival of a check from the Veteran's Administration. According to Fairview, Sharon Mellen wanted to tell Ms. Mellen personally about the arrival of the check. Apparently, Sharon Mellen wanted to proceed in this manner because she planned to buy Ms. Mellen a new wheelchair with this money but knew she would have to convince Ms. Mellen to agree to the purchase. Fairview argues that it was proper for Fairview's staff to withhold this information from Ms. Mellen because Sharon Mellen was authorized to handle Ms. Mellen's money.

¶ 53 It is undisputed that Ms. Mellen signed a document stating: "I hereby certify that Sharon Mellen has authorization to *assist me* in managing my personal needs allowance funds." (Emphasis added.) However, the language of this document does not in any way authorize Sharon or Fairview to deprive Ms. Mellen of her right to manage her personal finances by concealing the whereabouts of her funds or withholding information from her. As stated in *In re Guardianship of Valentine,* the right of every individual to manage his or her own financial affairs is jealously guarded. *Id.* at 702. It is impossible for one to manage one's financial affairs if one is purposefully deprived of the knowledge of relevant information, such as the arrival or deposit of a personal check. Furthermore, according to the language of section 75–5–401, Sharon cannot handle Ms. Mellen's money, or direct Ms. Mellen on how to spend her money, without Ms. Mellen's knowledge and consent, unless Ms. Mellen has been declared incompetent. The written document relied on by defendants does not constitute a relinquishment by Ms. Mellen of her right to manage her financial affairs, nor has Ms. Mellen been declared incompetent through the proper procedures.

¶ 54 It is important to note that Ms. Merkely and Ms. Maroney received written reprimands from Fairview for failing to tell Ms. Mellen about her check. In fact, a new policy was instituted by Fairview after this incident requiring that residents be informed of all their incoming funds, regardless of who assists them with their financial affairs. This change was, I submit, an acknowledgment by Fairview of what the laws and public policy of Utah require.

## VI. ARTICLE I, SECTION 1 OF THE UTAH CONSTITUTION

¶ 55 Finally, I disagree with the majority's rejection of article I, section 1 of the Utah Constitution as a source for the public policy at issue here. That section declares that "[a]ll men have the inherent and inalienable right to ... acquire, possess and protect property." The majority claims that while these provisions "protect the right to acquire, possess, and protect property, they do not enunciate the narrow type of policy envisioned by case law creating the public policy exception." It is difficult to imagine a right more fundamental and more well understood than the right to "protect" and manage one's own property, including one's financial affairs. Unlike the majority, I believe that public policies so broad and unquestioned as these are in fact enforceable through an ex-

ception to the at-will employment rule. This is particularly so where the Utah legislature, its regulatory agencies, this court, and the federal government have all incorporated the policy into law. Constitutional rights by their nature are fundamental, and I am at a loss to understand the majority's rejection of the right to "acquire, possess and protect property" as a reflection of universal public policy in the state of Utah. For the foregoing reasons, I would reverse.